UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MATTHEW SCOTT,

                   Petitioner,                    **DECISION AND ORDER**

    -vs-                                  **No. 03-CV-6274(VEB)**

BRIAN FISHER,

                   Respondent.

## I.      Introduction

*Pro se* petitioner Matthew Scott ("Scott" or "petitioner") has filed a petition for a writ of habeas corpus challenging his conviction following a jury trial in Monroe County Court on charges of (felony) murder in the second degree, as an accomplice (N.Y. Penal Law §§ 20.00, 125.25(3)), and two counts of attempted robbery in the first degree (N.Y. Penal Law §§ 20.00, 110.00, 160.15(1), (2)), as an accomplice. The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

## II.     Factual Background and Procedural History

### A.     Overview

The conviction here at issue stems from the fatal shooting on October 17, 1994, of sixteen-year-old George Johnson (a/k/a "Pookie" and "Poochie"), who, with Scott's permission, was using Scott's apartment on Hudson Avenue as a "headquarters" for his (Pookie's) drug-dealing operation. The shooting occurred at Scott's apartment while several other individuals were there playing cards and watching Monday night football. Some of these visitors, one of whom testified as an eyewitness at trial, were also using crack-cocaine they had purchased from

Pookie that evening.

When Scott was questioned by police on the night of the shooting, he denied any involvement in or knowledge of the attempted robbery or the shooting. Glaston Gaines, who had a severe crack addiction as well as a lengthy history of drug-related convictions, was identified by several of the eyewitnesses as the shooter. On the basis of these identifications, the police picked up Gaines at a homeless shelter and arrested him. According to Gaines' statement given while in police custody, Scott had recruited him to take part in robbing Pookie of the proceeds from his drug enterprise. Gaines also told the police that Scott had provided him with the weapon used to shoot Pookie.[1] Gaines was convicted of murder in the second degree in a separate trial, and the judgment of conviction was affirmed by this the Appellate Division, Fourth Department of New York State Supreme Court. *People v. Gaines*, 258 A.D.2d 921, 687 N.Y.S.2d 920. After Gaines told police that defendant had solicited him to rob the victim, petitioner was questioned and made a statement to police indicating that he had solicited Gaines to rob the victim.

**B.      Co-Defendant Gaines' Statement to Police**

Gaines' statement to police, given on October 25, 1994 (eight days after the incident), is set forth below:

> My name is Glaston Gaines, I am 23 years old and have been staying at the Open Door Mission on Main St. I am currently homeless. About a week ago I was on Hudson Ave. I was at a house on Hudson across from Mark St. I had gotten high there before and I knew the man that lived there. I call him M [i.e., Matthew Scott]. I can't remember his real name. He is a tall dark skinned black guy and he lives upstairs in the back. I remember that I was pretty fucked up that night. I hadn't slept in two days. I had been smoking cocaine. While I was in front of M's house, M came outside and started talking with me. M asked me if I wanted to

---

[1]      Gaines' statement, which was not introduced on the prosecution's case-in-chief at Scott's trial, is quoted *infra* in Section II.B.

make some money. I said yeah! I asked him how? He said that there was a kid up in the house with a 2 G package. That means the kid had $2000.00 worth of money and drugs on him. I asked M if he had a tool because I didn't have one. He told me to hold on. M went back through the cut but I couldn't see if he went into the house or kept on going toward Weeger St. M came back about an hour later and handed me a black .380 semiautomatic gun. I don't know what kind it was. M just gave me the gun and told me to take the kid into the bathroom and do it. After that M went back into the house. I waited about fifteen minutes and went into M [sic] house. I bought a couple of sacks from a young kid inside. There was about 8 people inside and they were calling this kid Pookie. The only people in there that I knew were M and a kid whose brother went to school with me a long time ago. His name was Donald but this was Donald's brother and I couldn't remember his name. I just hung out getting high in M's house for a while.

After awhile, my friend Gillet [i.e., Anthony Latson] came to the door and knocked. M answered the door and let Gillet in. Gillet came in and walked up to me and told me not to do it. I don't know how he knew what I was going to do but he just kept saying, don't do it kid! don't do it. I just said to Gillet, don't worry, I'll see you outside! Gillet kept saying don't do it kid, but I had the gun in my dark blue hoodie and I just took it out and pointed at the kid they called Pookie. I told the kid to break himself! That meant to give me the money. Then all of a sudden the gun started going off. It went off about four or five times. I do no remember shooting the kid, I just remember the gun going off. After that I turned around and went downstairs and went over the fence. I dropped the gun by the fence, climbed the fence and ran through some streets to Upper Falls, frome [sic] there I ran over to Bay St then Niagara. Since then I have been staying at different houses across the city.

I have read this statement and it is true. I wanted to add that I was wearing a black and white bandanna and that came off in the back yard. Also the police told me tonight that the due that got shot was found outside. I don't know how he got outside and also I don't know how the window got broke [sic]. I didn't see anybody go through it.

Respondent's Appendix of Exhibits Submitted with Respondent's Answer to the Habeas Petition

("Resp't Ex.") H at 69-70. Based upon Gaines' statement inculpating Scott,[2] the police brought

Scott in for further questioning. At first, Scott maintained his innocence. Some time later,

---

[2]    The Court notes that Scott, through defense counsel, successfully moved for severance and was tried separately from Gaines. Gaines' statement thus was not admissible on the prosecution's case-in-chief due to the *Bruton* issues. Gaines' trial was held first and he was convicted.

however, after being told that Gaines had fingered him, Scott gave a statement to the police.

Scott related that he had first approached a man named Anthony Latson ("Latson", a/k/a "Gillet",

"Gillette," or "Gillie"), about robbing Pookie. Latson declined, so Scott asked Gaines, who

agreed to do the job.

### C.     Petitioner's Second Statement to Police

As noted above, Scott's first statement to the police, given on October 18, 1994, denied

any involvement in the shooting. His second statement, given after Gaines' was arrested, is set

forth below:

> On Monday October 17th, 1994, I was at my apartment playing cards, drinking
> beer and smoking cocaine with Jerry Durnham, Red or Larry, Pookie, Tim Henry,
> Willie[,] whose last name I do not know, Clevelnad [sic] or Bubba, Annette and
> Glass [Gaines]. Pookie was a young sixteen year old who was selling cocaine at
> my house. He was selling cocaine at my house for about three days. Pookie would
> give me six five dollar bags of cocaine. About and [sic] hour before Pookie got
> shot at my apartment Gillie [Latson] came over with a person I do not know. I
> spoke with Gillie at the top of my stairs leeding [sic] into my apartment. I started
> talking with Gillie about Pookie having a few bags of cocaine and I asked Gillie if
> he wanted to rip him off. Gillie told me that he didn't want anything to do with
> that. Gillie did not come in but left down the stairs. About ten minutes after Gillie
> left I saw Glass standing by my bedroom door. I walked up to him and told him
> that Pookie who I also referred to as the kid had about a grand or more on him. I
> asked Glass if he wanted to rip the kid off. Glass nodded his head. I told him that
> he should tell the kid that he wanted to buy a couple of sacks. To take him into the
> bathroom or the livingroom because there were a lot of people in the kitchen. That
> we would split what ever [sic] Glass got. I told Glass that he should get the kids
> [sic] attention when I got up from my chair and start walking towards my
> bedroom. I walked away from Glass and sat down at the table and continue
> playing spades. My partner was Jerry and Pookie's partner was Red. Pookie was
> sitting at the table with his back towards the kitchen counter. I was seated to
> Pookie's right. Jerry was near the door to my apartment and Red was seated to my
> right.
>
> About five minutes before the shooting there was a knock at my door. I asked who
> was at the door and the person answered that it was Gillie [i.e., Latson]. I opened
> the door and saw Gillie. Gillies [sic] friend who was with him earlier was about

-4-

half way up the steps. Gillie asked me where the guy was with the blue hoodie and a blue and white bandanna. I pointed towards my bedroom. Gillie walked in and walked up to Glass and said something to him. I did not hear what was said. I sat back down at the table. After Gillie was done talking with Glass and [sic] walked out the door. About two or three minutes later I got up and started walking towards my bedroom. This was the signal for the robbery to go down. I had just walked past [P]ookie when I saw Glass grab [P]ookie around the neck and I started hearing shooting. I first heard one shot followed by a second shot, then three more. At the first shot I hit the floor in my bedroom. At the second shot I started shaking then while the last three shots went off I heard people moving around. I heard glass break. Then it was quiet. I got up off the floor and peeked out my door. I thought I would see the kid lying on the floor, but he was not there. As I was comming [sic] out of my bedroom I was met by Jerry. Jerry said he was looking for the kid. I saw blood on the wall by the stove, [b]lood on the floor by the garbage can. Willie and Tim left my apartment followed by Cleveland and Annette were [sic] in the bathroom. I then went outside and saw Pookie lying on the sidewalk two doors down from my apartment on the same side and towards Clifford Ave. I saw the kid still alive because I could see him shaking. I did not get closer than eight feet. I saw the ambulance pulling up and I walked back to my apartment. While walking back I saw [b]lood on Thelma Green's rear steps and saw that my window was broken. I went back upstairs to the broken window and saw that there was blood on the window sill. I asked Jerry who broke the window and he told me that the kid jumped out the window breaking the glass.

I was taken down to the police station and I talked to Investigator Sheridan. I told him a story and was not truthful because I was scared. Nothing like this was supposed to happen. I did not meen [sic] for the kid to get shot. I did not give Glass the gun and I do not know where he got it. I will do all I can to help get the gun. I swear to [G]od that this is the truth. At no time was I forced by Investigator Schultz or Sheridan to say this, and it is the truth.

Investigator Sheridan had asked me earlier durring [sic] this interview about me knowing if Glass had a gun. I told him that while [m]e [sic], Tim, Red and Pookie were playing cards Glass had asked us all if anyone wanted to purchase a gun. I asked him what kind and Glass told us that it was a .380. No one wanted to buy it.

Resp't Ex. H at 72-73.

### D.     The Suppression Hearing

On February 23, 1995, a suppression hearing was held in Monroe County Court (Maloy, J.) to determine the admissibility of Scott's inculpatory statement to the police. Investigators

Sheridan and Schultz testified, as did Scott himself.

##### 1.    Investigators Sheridan and Schultz

Sheridan testified that he met with suspect Gaines on October 25, 1994. H.4.[3] Gaines had

become a suspect after several eyewitnesses identified him in photographic arrays. H.5. Sheridan

previously had contact with petitioner on the night of the homicide, when petitioner had provided

a two-page statement. Sergeant Givens took a second statement from petitioner on October 18,

1994. H.7-8. Sheridan spoke with Latson (Gillie or Gillet) on October 27, 1994. H.9. After

obtaining a statement from Latson, Sheridan then spoke again to petitioner on October 27, 1994.

H.9.

At about 3:45 p.m. on the 27th, Sheridan and his partner, Schultz, encountered petitioner

standing on his lawn in front of his house on Hudson Avenue. H.11. Petitioner agreed to

accompany them to the Public Safety Building; he was not placed in handcuffs. H.11. He first

was placed in the Physical Crimes office, a room about 15 by 25 feet, with seven desks for the

officers and investigators who work there. H.11. They arrived at 4 p.m. and Sheridan advised

petitioner that he was not under arrest, but he was going to advise petitioner of his *Miranda*

warnings, and petitioner agreed to waive his rights, responding "yeah" to each question. H.12-15,

35-36. Sheridan and Schultz stayed with petitioner in that office for about 30 minutes. H.12.

Petitioner indicated that he had graduated from highschool in South Carolina and could read and

write English "fine." H.15, 39-40. Sheridan observed that petitioner was "alert, conscious" and

had "no difficulty fielding questions, responding in a normal manner." H.16.  He did not appear

---

[3]       Citations to "H.__" refer to pages in the transcript of the suppression hearing held on February 23,
1995.

to be injured or ill, and did not make any complaints or request medical attention. H.16. He made

no comments to suggest that he had used any drugs or intoxicating substances that day. Finally,

he did not appear to be under the influence of alcohol or drugs. H.16-17.

Sheridan said that he had no difficulty understanding petitioner, and petitioner did not

express any difficulty in understanding him. Sheridan denied promising petitioner anything or

threatening him in any way. Petitioner was not handcuffed, and did not assert any of his rights

under *Miranda* during the interview. H.17. That is, petitioner did not ask for a lawyer; nor did he

decide to stop speaking with the police investigators. H.18.

After about 30 minutes, they moved down the hall to an interview room, about 10 by 12

feet. It has one door, overhead lighting, and a picnic bench bolted to the floor with a couple of

benches also bolted to the floor. H.18. There is a large window with metal grating over it.

Petitioner was not handcuffed, and neither investigator had his gun with him during the

interview. H.19.

The investigators and petitioner remained in the interview room for a "[c]ouple hours."

H.19. They discussed with petitioner that they had talked to quite a few other people since last

speaking with him, including the person responsible for the shooting, and "their versions as to

exactly his involvement were quite different than what he initially had stated, and [they]

questioned him as to exactly his involvement in the shooting death of George Johnson." H.19.

"[F]or a period of time," Sheridan stated, petitioner "maintained that the original

statement that he had given . . . on the night of the shooting was correct, but there did come a

point in time in which he admitted that he didn't tell . . . the truth, that he gave [them] different

versions." H.20. Schultz indicated that they "mentioned to him that [they] had the other

information," and that is when petitioner "started to change his version" to something different from what he had given to Sheridan initially. H.79. Specifically, petitioner said that while at his apartment Gaines/Glass and Latson/Gillet "discussed with him that they were going to rob the victim and that he had given his okay but that he wanted a cut of the robbery." H.21. This was at about 4:50 p.m. Thus, the first change was Scott saying that Gaines and Latson discussed the robbery, and he said he wanted a cut. The investigators asked him to "expound on it" and eventually told him that they still did not believe him. H.49. He then made a second change, which was that he went to Latson and Gaines and asked if they would rob Johnson (a/k/a Poochie or Pookie).

Petitioner "later changed that version to the fact that he had approached Gillet and Glaston and had told them that the victim was carrying a large sum of money and that he wanted – he wanted them to rob – rob the victim." H.21, 80. Petitioner said that this was about 30 minutes later, at 5:20 p.m. H.21.

Sheridan continued questioning petitioner, because they "didn't feel that he was being completely truthful . . . and [they] kept up that line of questioning until; there came a time in which [they] took a statement from him," H.22. Sheridan admitted that throughout the interview, they told petitioner "several" times that they did not believe him, that they thought he was lying. H.41-42, 47-48. At 5:35 p.m., they confronted petitioner with the written statement Gaines/Glass had given to the investigators. H.22. The interview continued for about another hour and a half. H.23. Sheridan and Schultz testified that Scott changed his story *before* reading Gaines' statement. H.48, 79.

At about 6:30 p.m., they took a 15 minute break. When the investigators returned,

petitioner was allowed to use the restroom, and they reconvened in the physical crimes office to type up petitioner's statement. H.24-25. The typing process took until 7:52 p.m. and was done by Investigator Schultz.

After the statement was completed, it was given to petitioner to read out loud. H.26. He made some minor corrections to typographical errors, and put his initials next to the corrections. H.28, 83-85. Investigator Schultz then read the statement aloud. H.26-27. Petitioner signed the statement at 8:13 p.m. and went to use the restroom. H.29. When he returned, about four more lines were added to the statement; that was completed shortly after 9 p.m. Scott read it aloud. H.29-30. Petitioner was booked at 9:25 p.m.

On cross-examination, Sheridan admitted that when they approached petitioner on October 27th, they did not tell him that his status had changed in their minds from witness to suspect. H.33. Sheridan felt that there was no need for them to do so. H.33. Sheridan knew that Scott had no prior criminal arrest record. H.40.

According to Sheridan, they only moved the interview out of the physical crimes office into the smaller interview room because several officers had come into the office and it was "a little disruptive" in there. H.43, 81.

Sheridan's partner, Schultz, testified consistently with Sheridan's testimony. *See* H.57-88.

### 2. Petitioner's Suppression Hearing Testimony

Scott agreed that he voluntarily spoke to Investigators Sheridan and Schultz on the afternoon of October 27, 1994. H.89-90. He also stated that he had been using drugs, "[a]bout a hundred dollars or more" of cocaine, before the investigators arrived at his house that afternoon. H.90. That was "[p]robably a little more than a sixteenth" of "an 8-ball," which is an eighth of an

ounce. H.91. Scott said that he was "really high." H.91. Petitioner said that as far as the *Miranda* warnings, they only told him that he had the right to remain silent and that anything he said would be used against him in a court of law. H.92. He denied that they told him that he was entitled to an attorney free of cost. H.93. Petitioner stated that they did not ask him about his education or his ability to read or write while they were still in the first room. H.93-94. Scott testified that after he told the police his version of events, they told him that he "was lying" and "wasn't telling them the truth." H.94, 96-97. According to Scott, the investigators told him he was lying "[f]our, five, maybe six times." H.95. After the last time they told him he was lying, they brought him to the smaller interview room. *Id.*

Then, the officers "went and got a statement of Gaston [i.e., Gaines] or somebody and put it – set it in front of [him] and told [him] read this, this is what they have against [him]." H.97. Scott said that he was "pretty much" able to read the statement, but "[s]ome of the things [he] couldn't understand, you know?" H.97. Petitioner said that his "reading is not all that great" and his spelling is "[l]ousy." H.97.

According to petitioner, Investigators Sheridan and Schultz told him, "[M]y ass would be grass if I don't tell them the truth." H.98. This was after they had shown him Gaines' statement. H.98-99. Petitioner said that he "didn't know how to take that" but he knew "it's some kind of a threat or something." H.99. Petitioner explained that he was "still high and it was kind of scary," and that he had not made any admissions to them up until that point in time. H.99-100.

Scott testified that while Investigator Schultz was typing, Scott was actually giving the *same* statement he had given during his prior interviews, not an inculpatory version of events. H.101. Scott stated that after Investigator Schultz was done typing, he read the statement out

loud, then he and Sheridan signed it, and they told petitioner that if he signed it, they would let

him go. H.102. Petitioner testified that he "sort of" believed them. *Id.* He explained that he

signed it even though it was not the truth because they said, "If you don't sign this statement,

we'll put you away for a long time." H.102. Defense counsel then went through all of the

handwritten, initialed corrections to typographical errors in the statement. Petitioner denied

making any of the corrections, asserting that he did not know what he was initialing. H.103-04.

On cross-examination, petitioner admitted that in his first statement, he signed it to

indicate that it was true and accurate. H.106. The same was true that of his second deposition to

police when he was shown a photo array. H.107. Petitioner admitted that he understood what he

was signing when he signed those documents, and that it was not a problem for him. H.107.

The prosecutor questioned Scott about his previous employment as a truck driver in New

York state. Scott admitted that he had completed both a written course and a road test, and he

also had a regular driver's license. Scott had worked for the truck driving company for four or

five years as a delivery-person. He admitted that he had to check the invoices on what customers

were returning for crediting their accounts and was able to do that. H.109-110. He admitted that

reading and writing is "not [a] real bad" problem for him. H.110. The prosecutor also questioned

Scott about his divorce proceedings on July 21, 1994, just shortly before the shooting. H.110.

Scott admitted that he had been able to fill out the paperwork in order to apply for public

assistance. H.111. He stated that he was "all right" at mathematics.

With regard to the amount of cocaine he had been smoking before the interview with the

police, Scott stated that the hundred-dollars-worth was not the total amount he consumed; it was

shared among him and his three friends, so he had a one-quarter of the total amount. H.112-13.

So, he had had about $25-worth of crack cocaine on the afternoon of October 27th.

With regard to his alcohol use prior to speaking to the police, Scott testified that he had been drinking "four, five 40-ounces [sic]." H.113. He said that he was "highly intoxicated." H.114. However, he admitted that he specifically remembered what he told the investigators during the interview of the events of that afternoon and evening. H.115-18. He recognized what was true and allegedly not true in the statement typed by Schultz, and understood that the purportedly prepared statement "had [him] admitting to being a part of a murder[.]" H.118-19. He said that he understood all that, despite having over 200 ounces of alcohol and a sixteenth of an eighth of an ounce of cocaine. H.119. Scott said, "it might have had an effect on [him]" but he "just didn't pay it no attention . . . ." He "was high" and they told him they were "going to let [him] go." H.119. Petitioner was forced to agree that the alcohol and the cocaine really had "[n]ot much" of an effect on him. H.119-20. Scott then claimed that when he read the statement prepared for his signature by Schultz, he actually thought that he was reading Gaines' statement," because Gaines' statement and his statement "sound the same.". H.121-22. He stated that the statement did not sound like an admission to murder to him. H.122. He did agree that the part added to the end of his statement, regarding Gaines having a gun that he was trying to sell, was true. H.123.

### 3. Oral Argument and The Suppression Court's Ruling

Defense counsel argued that the investigators had committed several acts which cast doubt on their credibility. In particular, counsel pointed to their having taken petitioner to the smaller interview room and argued that it was "to make him feel insecure and frightened and they didn't want to be overheard . . . ." H.126. Counsel stated that they "wanted to just advise him of a

couple of his rights to perhaps make him secure and not advise him of the rest of his rights and

nobody would know the difference." H.126-27. Finally, counsel claimed that it was "incredible"

for the investigators to testify that petitioner pointed out and corrected spelling errors in the

statement he signed. H.127. Counsel argued that "he could no more know how to spell some of

those words than somebody who probably grew up in the same environment he did." H.127.[4]

The prosecutor pointed out that based on the move from one room to another, defense

counsel had concluded that the police were "A, not advising the defendant that they hope to pin a

murder on fully of his *Miranda* rights; B, hoping to avoid witnesses to those efforts; and C,

apparently conspiring between themselves to get Matthew Scott for the act of soliciting and

separating – or supporting and plotting the murder two days after they have obtained a full and

complete confession from the trigger man who shot the victim." H.129-30. The prosecutor also

argued that Scott's testimony that despite the fact that the investigators did not believe him, that

he signed the statement "without knowing what it was at all under the mistaken believe that he

would be allowed to go home by two investigators who have kept him for hours in this coke- and

alcohol-induced drug haze where he is totally confused and yet clear on all the details of the

entire night." H.132.

The suppression court made the following findings of fact and conclusions of law:

> Investigators Sheridan and Schultz . . . stopped Matthew Scott, who was next door
> or near his home, asked him to come down to the Public Safety Building to
> answer questions at which point he came voluntarily and when he arrived at the
> Public Safety Building, they had read him his rights . . . . He waived his rights and
> discussed the case. He had previously given a deposition to the officers.
> Eventually, he made admissions which were reduced to writing, . . . . He read the

---

[4]     Apparently, Latson had been charged with another murder and was not available to testify at Scott's trial. H.128-29.

exhibit, whether to himself or out loud. It was read out loud by Officer –
Investigator Schultz and then he [petitioner] signed the statement.
The Court find [sic] that his rights having been read, the statement is admissible
as a voluntary statement, to be admissible at trial.

H.132-33.

### E. Petitioner's Jury Trial

The indictment charged Gaines and petitioner with second degree (felony) murder, and

attempted robbery under two theories–attempted robbery in the first degree with serious physical

injury (N.Y. Penal Law §§ 110.00, 160.15(1)), and attempted robbery in the first degree with use

of a deadly weapon (N.Y. Penal Law §§ 110.00, 160.15(3)). Scott was charged as an accessory

under N.Y. Penal Law § 20.00. Scott and Gaines were tried separately, with Gaines' trial

proceeding first. As noted above, Gaines was convicted, and the judgment was upheld on direct

appeal.

### 1. The Prosecution's Case-in-Chief

The state's case-in-chief rested primarily on Scott's confession and the testimony of the

four eyewitnesses–Annette Willis ("Annette"), Cleveland Willis ("Cleveland"), Jerry Dunham

("Dunham"), and Tim Henry ("Henry").

### a. The Eyewitnesses

Dunham, aged 46 at the time of trial, was Scott's roommate at 505 Hudson Avenue.

T.382.[5] They had met "[b]y chance" in the winter of 1993. Tim Henry was a very good friend of

Scott's; he had known him for three or four years. T.366.

When Dunham arrived home from work on October 17th between 5 p.m. and 5:30 p.m.,

---

[5]    Citations to "T.__" refer to the transcript of petitioner's jury trial.

he took a nap for a "couple of hours." When he awoke, Scott was there. Other people started arriving later on: "Tim, Willie, Bubba [i.e., Willis], fellow named Red, Annette, the kid named Poochie, the fellow that did the shooting and another guy that they came in together." T.386. It was essentially a party atmosphere: "They were playing cards, drinking, smoking cocaine" that night. T.387. The victim, Poochie, was selling drugs. Dunham had met Poochie the week before when Poochie had come over to his and Scott's apartment. T.387. Dunham had not seen the shooter (i.e., Gaines) before that night. Henry related that Poochie had come by earlier and asked petiitoner "could he sell out [of] his house; and Matt said yes, for a cut, for a fee, not a problem." T.356.

Dunham admitted that he had used drugs before he took his nap but did not use any drugs after that. T.388. The other people using drugs that night were getting the crack cocaine from Poochie. Some of the partygoers were in the living room watching Monday night football. T.389. Dunham was playing cards in the kitchen with Scott, Poochie and Red (i.e., Larry Sproule). Dunham and Henry indicated that Gaines and "the other fellow" first came by at around 9:30 p.m. T.353-54. They bought some cocaine, smoked it, and then left (the other fellow first, followed by Gaines). About twenty minutes to half-an-hour later, Gaines returned by himself. T.391.

Tim Henry had gotten there around seven; he stayed for an hour and left, returning at about nine; by that time there were more people there. T.352.  Henry knew Gaines from seeing him around. T.352. Henry testified that at one point, he went into the bathroom, turned on the light, and he could see Gaines in the mirror behind him. T.355. Gaines was just standing there, "thinking." Henry used the bathroom and as he was leaving he said, "You want me to cut out the

light?" Gaines said, "Sure, cut it out," and Henry went back to his card game, leaving Gaines in the dark in the bathroom. T.355.

Willis (a/k/a Bubba), another visitor at Scott's that night, had known Scott through friends and from around the neighborhood for about two years. T.257. His wife, Annette McKinney Willis ("Annette"), knew Scott for about three and a half years; she used to go to his apartment to get high. T.298. The day before the shooting, Scott was standing outside his apartment and called out to her that he had someone up in his apartment selling cocaine. T.319. Annette had bought cocaine at Scott's on numerous occasions on the day before and the day of the shooting. T.322.

On the night of the incident, Willis and Annette had gone over to Scott's apartment separately. They stayed for about two hours, went home, where they "probably argued," and returned later to petitioner's apartment. T.258-61, 299-302. While Willis went across to buy something at the convenience store, Annette went upstairs to Scott's apartment. T.325. As she was on her way to Scotts apartment, Annette saw two people on a porch two houses away looking at her. T.325-26. She made eye-contact with the men. One of the men was Gillett or Gille, whom she had often seen around the neighborhood; the other one she had seen one time prior. T.327-28, 329. She would see them both again at Scott's apartment later.

Once upstairs, Annette bought some cocaine from a "young guy" named "Tootie" or "something to that effect." T.263. "Tootie" had been there all evening selling drugs. *Id.* While Annette was standing in the kitchen cooking up the cocaine, Gaines came out of the bathroom with a hood over his head. Willis asked Gaines, who was standing behind Annette, not to stand to close to her, because Gaines was being "skittish" and "nervous". According to Willis,

Gaines was "more or less trying to hide his face" and was "standing in the corners" and "hiding in chairs." T.265, 266, 283. Neither Annette nor Willis had never seen Gaines before that night. T.283, 305.

Later on, two black males "came to the door, knocked and asked to talk to Matt and then they went and talked to the shooter after that." T.395. Dunham, who had been playing cards at the kitchen table with Scott, Poochie and Red, answered the door and told Scott that the men wanted to talk to him. Scott walked outside the apartment into the hallway and talked to them for "about thirty seconds." T.395. The three of them came back inside. The black males, whom Dunham did not know, "went through the bedroom [i.e., Scott's bedroom, off the kitchen] to talk to the shooter." T.396. Dunham could not hear their conversation, which lasted for about a minute. T.397. Dunham said that there was no arguing or fighting or anything like that. When the two men came out, they said, "'Let's go. Don't do it.'" T.397. That remark was made to the shooter (Gaines), who was standing in the doorway of the bedroom. T.397. The two men then went towards the entry door of the apartment and "[t]hat's when [Dunham] heard the click and that's when the shooter grabbed the kid by the head" and "[g]ot him in a headlock." T.398. Poochie had his back to the shooter, who came from the doorway of the bedroom, "grabbed [Poochie], put him in a headlock, put the gun up to his head." T.399-400. The shooter said, "Get back," and Dunham heard the first shot go off. T.400-01. Dunham related that there were "at least four shots." Two were fired rapidly, followed by a pause, and then two more. T.402. The shooter backed up through the living room to the entry door and left.[6]

---

[6]    The police found shell casings (.380-caliber) in the middle of the kitchen floor and bullet strike-marks on the kitchen cabinets and counter-top. T.466, 487, 491-96, 509-10. There was some blood in the kitchen and also on the broken window in the living room. T.466.

Annette said the shooting occurred while she was still cooking her drugs in the kitchen. T.307. There was a knock at the door; Scott, who was sitting down playing cards, got up to answer the door. There were two black males, one of whom Annette knew from the neighborhood and the other whom she had seen about twice. T.308. (She had seen these men on as she was coming up to Scott's apartment; they were sitting on a porch about two houses down.). Petitioner went and stood out in the hallway for a mintue or two. 307-08. Petitioner then re-entered the apartment with the two men. T.335. Annette stated that petitioner did not sit back down again to finish playing cards; "[i]t was more or less like he was getting out of the way, moving around." T.335. Willis related that one of the men stood at the door and the other walked up to the shooter who was standing near the kitchen counter almost in the living room, and asked him, "What you [sic] gonna do, man? What you gonna do?" T.309, 335 ("What's up man? You gonna do it or what."). The man "nudged" the shooter, and Annette "thought there was going to be a problem . . . ." T.309, 339. The shooter said, "'Hold on a minute,' and about two seconds later he ran up to the victim, who was seated at the table with his back to the counter, and grabbed him behind his neck." T.309-10, 311, 314. The shooter pulled the victim "out of the chair and before he could say 'Give up the drugs,' he had shot him." T.310. According to Annette, as the shooting was happening, petitioner "was on his way going out the door, and the guy, he just – everybody, they just scattered." T.310. Annette conceded that she had not told the police that detail in her statement given immediately after the incident.

Willis described the shooting as follows: "There was a knock at the door and Matthew opened the door and the guy came in and stepped to the shooter . . . and asked him, 'What's up?'" After Scott answered the door to let "the guy" in, Willis did not see Scott any more. T.293.

The "guy" Willis referred to was Latson (a/k/a Gillet or Gillie), whom Willis had seen around the neighborhood. T.289. Willis never saw petitioner with a gun that night. T.274. In any event, after Latson asked the shooter, "at that time the shooter stepped past [Willis] and grabbed the kid, Tootie, in a choke hold and threw a gun to his head and said, 'Give up the drugs,' and fired" before the vicitim could do anything. T.267-69, 291-92. Willis heard about five shots. T.294. Willis, Annette and Tim Henry all ran for cover in the bathroom. T.270. Duhman eventually knocked on the door and told them that they could come out. T.315. Annette testified that Scott was coming up the stairs at that point. T.3178. Annette and Willis stayed in the apartment for a few minutes; she wanted to find her "stuff" but she could not, so they left. T.317.

Henry described the shooting as follows: "Two guys came to buy drugs. Matt called the young kid who was selling the drugs . . . . The kid came in the kitchen, sat down. I was playing cards. He pulled out the dope, put it on the table. The guys who came in the house, who Matt had called in the house to buy the drugs, they looked at it. Glaston, who was in the bathroom at the time that I cut the lights on, not even 20 minutes later – before, comes, out grabs the kid in a headlock and shoots him. T.358. Because he was playing cards, Hendry did not know if the two men talked to Gaines first. T.358-59. Gaines came out of the bathroom and approached the victim from behind; before he grabbed him, he said, "What's up?" And the victim said, "what's up?" Gaines then grabbed the kid in a headlock and pulled a gun from the small of his back and fired. T.359.

Once the shooting stopped, Dunham then looked for Poochie in the apartment, trying to find out if he was okay. He did not find Poochie, but did see that one living-room window was broken. Dunham found Scott in his bedroom. He then found Annette and Willis in the bathroom,

and Tim in his (Dunham's) bedroom. Dunham told them to stay, but they did not. T.271-72.

Dunham said that Scott left for a few minutes; when he returned he said that Poochie was lying

outside on the sidewalk. T.407. Dunham recalled that Scott started "sweeping the floor[,]"

"[c]leaning up the kitchen . . . ." T.408. Dunham told Scott "to leave everything alone, it would

be evidence." T.408. Scott did not reply, and did not stop sweeping until a while later. T.409.

Dunham went down to the police station and gave a statement. Later that day (October

18th), two officers came back to the apartment and showed Dunham and Scott a photo array,

separately. Dunham identified Gaines as the shooter from a photo array. T.412.

Dunham testified that at one point before the shooting, Gaines "offered[,] did anybody

want to buy a .380 handgun." T.392, 437.  Nobody in the apartment expressed any interest in

purchasing the gun. T.392. According to Dunham, Gaines did not display the gun to anyone.

T.392. Gaines then went into the kitchen to smoke. T.393.

### b.    The Medical and Physical Evidence

The county medical examiner testified that there were two bullet wounds on the victim.

One was a perforating wound to the face, entering just below the cheekbone on the left side of

the face and exiting above the lip on the right side of the face. T.539. This was a relatively

superficial injury. T.544. The second wound was not perforating, meaning that the bullet did not

go through the body; it entered at the lower left back of the victim and had come to rest under the

skin on the front of the chest. T.539-40. The bullet had struck the heart, perforating the right

ventricle, and was the cause of death. T.543.

Defense counsel objected when, during his direct case, the prosecutor began to question

Investigator Sheridan about the process of gathering a written statement from a witness, in

particular, Gaines. T.568-69. Defense counsel argued that "this trial is not about the admissibility of the statement relating to Glaston Gaines. . . ." T.569. The prosecutor argued that it was relevant to the issue of "how these interviews [with the police] took place and how they were conducted." *Id.* The trial court sustained defense counsel's objection. *Id.* Investigator Sheridan testified that after speaking with Gaines and Latson, they re-interviewed Scott. T.572.

### c.     The Police Witnesses

Investigators Sheridan and Schultz testified essentially consistently with their testimony from the *Huntley* hearing regarding their investigation of the Poochie homicide, their questioning of Scott and Scott's provision of two statements to the police about what had transpired on the night of the shooting.

### 2.     The Defense Case

The defense's only witness was Gaines who, through his attorney, took the stand and asserted his Fifth Amendment privilege against self-incrimination. T.745-48. Accordingly, in line with its earlier rulings, the trial court informed the jury that Gaines was unavailable to testify and that they should not speculate as to why he was not there. T.748.  At the defense request, Gaines testimony (both direct and cross-examination) from his April 1995 trial was read into the record. T.748, 751. The transcript of Gaines' testimony given on April 12, 1995, was marked as Court Exhibit 2 in Scott's trial. T.751. A copy of this transcript is appended to this Decision and Order is made a part hereto.

Petitioner elected not to testify in his own behalf. T.756.

### 3.     The Prosecution's Rebuttal Case

To rebut the testimony provided by Gaines through the reading of his earlier trial

testimony, the prosecution sought to move into evidence (1) the written statement of Gaines given to the police, quoted *supra* in Section II.B; and (2) a certificate of conviction showing Gaines was found guilty of first degree manslaughter, second degree murder, and two counts of attempted first degree robbery. T.756-57. Defense counsel stated, "I have no objection to those two exhibits being put into evidence." T.757.

The prosecutor then made an offer of proof regarding the testimony he intended to elicit from Investigator Schultz regarding a meeting between Gaines, the prosecutor, and Gaines' defense counsel, in February 1995, prior to the commencement of Gaines' trial. During this meeting, Gaines indicated that while what he had said in his written statement was mainly true, it was incorrect inasmuch as it said that Latson (i.e., Gillette) had not been a part of the scheme. T.758. Essentially, Gaines wanted the prosecutor to charge Latson as well. Gaines also informed the prosecutor that his written statement was true in regards to Scott's involvement, and offered to testify to that in exchange for a disposition of his case. Gaines' conditions were that Latson also be charged and that he wanted a disposition that did not entail a life sentence. T.758. The prosecutor indicated at the time that was not possible or appropriate, and the meeting terminated without any type of plea offer being extended to Gaines.

Defense counsel objected to the introduction of the rebuttal testimony, to be offered through Investigator Schultz, concerning Gaines' pre-trial meeting with the prosecutor. T.760-61. Counsel pointed out that Investigator Schultz's testimony about what Gaines had said at the meeting was hearsay, and because Gaines was unavailable to testify, it would be unfair to the defense because there was no opportunity to cross-examine him. The trial court noted that it was "not an issue of testimony" but rather was, "did he make a prior inconsistent statement, not

whether or not the statement is true or false," and therefore the cross-examination of the declarant, Gaines, was not important. T.761-62. The trial court invoked the "rule of completeness," which he referenced on several occasions, stating "[i]t's the prior inconsistent statement which under the rule of completeness we allowed the testimony [given by Gaines at trial] to be read in and the impeachment materials also must come in." T.762. The prosecutor then observed that "in light of the transcript which has been heard by the jury, I think this [i.e., the written statement] is a separate and second prior inconsistent statement to the transcript testimony which has been offered." T.762. The trial court agreed. Defense counsel at that time did not ask for any limiting instructions to be given to the jury with regard to how it should consider (1) the written statement by Gaines or (2) the testimony to be given by Investigator Schultz. T.762.

Investigator Schultz then proceeded to testify consistently with the prosecution's offer of proof, outlined in the preceding paragraphs of this section (i.e., Section II.E.3, The Prosecution's Rebuttal). When the prosecutor requested that Investigator Schultz read into evidence Gaines' statement to the police made on October 25, 1994, defense counsel (rather inexplicably, in light of his express agreement with the introduction of the written statement as an exhibit), objected. *see* T.768:

> Mr. Lewis:    Objection, Judge. It's a statement that's already in evidence. It speaks for itself. There's no reason to read Gaines' statement to the jury.
>
> Mr. Huether:   Your Honor, I'd ask that it be published because it has not been published previously and in order to compare and understand the prior inconsistencies of any statements between transcirpts that were offered and prior statement that were made by the witness, I think it's fair to publish it at this time

The Court:    I agree. You may read it.

.

T.768.

On cross-examination, defense counsel elicited from Investigator Schultz that they did not question Gaines, during the pre-trial meeting, about what Latson's (i.e., Gillette's) involvement actually was. T.773. Investigator Schultz agreed that the only way they could have determined whether any kind of deal could be struck with Gaines, they needed to ask Gaines what did Latson do that was criminal. T.773. During the meeting, they did say to Gaines that they needed corroboration and "the only thing he said was [Latson] was part of it and that's as far as he went into Anthony Latson's involvement . . . ." T.774. Investigator Schultz testified that he did not, and does not, believe Gaines' claim that Latson was involved. T. 774.

On re-direct, Investigator Schultz testified that the fact that Latson was at petitioner's apartment was not sufficient corroboration, in light of Latson's statement denying any involvement and petitioner's statement that he had asked Latson to participate but Latson had declined. T.776.

On re-cross, Investigator Schultz admitted that apart from the statements by Gaines, Latson, and petitioner, there was not any evidence that petitioner "got together with these people and talked about them committing this crime[.]" T.776.

### 4.    Summations, the Jury Charge, and the Verdict

Defense counsel, notably, did not at any time request limiting instructions as to *any* of Gaines' statements or prior testimony. During the charge conference, defense counsel still did not request any special jury instructions in that regard. Interestingly, it was the prosecutor who

requested that "since there were some areas that were subject to impeachment, I'd ask you to

instruct on that. Secondly, on prior inconsistent statements, the use of and how to consider those,

especially in light of the offer this morning by the People against the transcript of Glaston

Gaines." T.780.

With regard to the jury instructions, the only point at which the trial court charged the

jury about how to consider prior inconsistent statements was as follows:

> Some evidence that came, for example, a statement of the defendant Glaston
> Gaines was in [sic] rebuttal. That evidence has nothing to do with this case
> other than the credibility of the witness. Some inconsistent statements were
> probably implied and elicited from witnesses. That does not go to the direct case
> but merely to the credibility of the witnesses in judging what you believe and
> disbelieve from a witness's testimony.

The jury returned a verdict convicting Scott as charged in the indictment of two counts of

attempted first degree robbery, and one count of second degree (felony) murder. T.862-63.

Prior to sentencing, Scott's trial counsel filed a motion to set aside the verdict pursuant

C.P.L. § 330.30.[7] The basis for the motion was an affidavit obtained by counsel from a juror,

---

[7]     C.P.L. § 330.30 provides that "[a]t any time after rendition of a verdict of guilty and before
sentence, the court may, upon motion of the defendant, set aside or modify the verdict or any part thereof upon the
following grounds:

> 1. Any ground appearing in the record which, if raised upon an appeal from a prospective
> judgment of conviction, would require a reversal or modification of the judgment as a matter of
> law by an appellate court.

> 2. That during the trial there occurred, out of the presence of the court, improper conduct by a
> juror, or improper conduct by another person in relation to a juror, which may have affected a
> substantial right of the defendant and which was not known to the defendant prior to the rendition
> of the verdict; or

> 3. That new evidence has been discovered since the trial which could not have been produced by
> the defendant at the trial even with due diligence on his part and which is of such character as to
> create a probability that had such evidence been received at the trial the verdict would have been
> more favorable to the defendant."

who had contacted the trial judge and advised him that "the jurors didn't really feel that [petitioner] was guilty of the murder." S.3.[8] According to defense counsel, the affidavit stated, in sum and substance that

> [T]he jury felt that they had no choice but to convict Mr. Scott of the murder. They felt he did not intend the murder to take place. They also felt that Mr. Scott did not know that a gun was going to be used, or to take any money or drugs from the victim. And also that the jury did not believe that Mr. Scott provided the gun to Glaston Gaines.

S.3. Defense counsel argued that this meant that the evidence did not show that petitioner intended a robbery to take place. *See id.* After hearing argument from both parties, the trial court ruled on the record as follows:

> The evidence was overwhelming that Mr. Scott at the very least was an accessory to this particular crime providing the drug house for which the drugs were being sold, also evidence that the intent was to rob [the victim] of money and drgus at his location. More than enough to convict him under the [Penal Law] Section 20 accessorial rule. There's sufficient evidence in the Court's mind that this was a felony murder in furtherance of that robbery. Granted felony murder is a difficult law for some jurors to accept and follow and they were directed they must follow the law even though they disagree with that law, which they did. The law was read to them I think on three occasions and I feel satisfied with the verdict.

S.10.

Petitioner thereafter was sentenced to an indeterminate term of 20 years to life in prison.

S.14. The Court notes that petitioner's co-defendant, Gaines, was sentenced by the same judge to the maximum term possible, 25 years to life.

On direct appeal, Scott was represented by new counsel. Appellate counsel urged the

---

N.Y Crim. Proc. L. § 330.30(1)-(3).

[8]     Citations to "S.__" refer to pages of the sentencing hearing transcript.

following grounds for reversal of the conviction: (1) the admission of Gaines' written statement and the rebuttal testimony of Investigator Schultz deprived petitioner of his right to due process and right to confront witnesses against him; (2) the trial court failed to give any contemporaneous limiting instructions regarding Gaines' statement and Investigator Schultz's rebuttal testimony, and the subsequent limiting instruction during the final charge was insufficient as a matter of law; (3) the verdict was against the weight of the evidence; (4) the evidence supporting the conviction of felony murder was legally insufficient; (5) the trial court failed to properly respond to the jury's questions regarding the relation ship between the charges of attempted robbery and felony murder; (6) the trial court erred in admitting petitioner's confession at trial; and (7) the necessary corroboration evidence with regard to petitioner's confession was insufficient as a matter of law, and the trial court erred in failing to charge the jury regarding the corroboration requirement. *See* Petitioner's Appellate Brief at 2-3, Resp't Ex. F at 8-9.

The Appellate Division, Fourth Department, of New York State Supreme Court, unanimously affirmed the conviction. *People v. Scott*, 62 A.D.2d 1021, 693 N.Y.S.2d 379, 380 (App. Div. 4th Dept. 1999). The New York Court of Appeals denied leave to appeal. *People v. Scott*, 93 N.Y.2d 1027 (N.Y. 1999).

By means of a *pro se* motion to vacate the judgment pursuant to C.P.L. § 440.10 filed with the trial court, Scott argued that his trial counsel had been ineffective because "at no time during the course of the trial did [trial counsel], object to or move to preclude the written statement of Glaston W. Gaines, introduced as rebuttal evidence by the People[;] communicate and negotiate a plea for defendant[;] or object and preserve issues for appellate review." C.P.L. § 440.10 Motion, ¶9, Resp't Ex. M at 88. Scott asserted that trial counsel failed to preserve the

following "other issues for review on direct appeal," namely, (1) that trial counsel should have objected to the trial judge's supplemental instructions to the jury during their deliberations, and (2) trial counsel failed to appropriately preserve a challenge to the legal sufficiency of the evidence. *See id.*, ¶11, Resp't Ex. M at 89.  Respondent opposed the motion, stating that it was "clear from defendant's moving papers [that] his claims are matters of record which could have been raised on appeal, thus requiring denial of the motion (CPL 440.10(2)(c)), and, moreover, some of the underlying substantive issues were specifically addressed on appeal and were found to be either not erroneous or harmless error. Resp't Ex. N at 93. Finally, respondent noted that any plea offer would have been communicated to the defense in court and on the record. *Id.* The trial court summarily rejected petitioner's C.P.L. § 440.10 claims stating that the motion was "denied." Resp't Ex. O at 95. Leave to appeal to the Appelate Division was denied. Resp't Ex. T at 113.

Scott, acting *pro se*, subsequently filed a motion for a writ of error *coram nobis* attacking the effectiveness of his appellate counsel. This was summarily denied. *People v. Scott*, A.D.2d 974, 749 N.Y.S.2d 454, 2002 N.Y. Slip Op. 08513 (N.Y.A.D. 4 Dept. Nov 15, 2002), *leave denied*, 99 N.Y.2d 658 (N.Y. 2003).

This timely federal habeas petition followed. For the reasons set forth below, I find that habeas relief is not warranted and, accordingly, must dismiss the petition.

## III.    Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

-28-

as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523 (2000); *accord Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir. 2003); *Clark v. Stinson*, 214 F.3d 315, 320 (2d Cir. 2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *accord Sevencan v. Herbert*, 342 F.3d 69, 73-74 (2d Cir. 2002), *cert. denied*, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. *Williams*, 529 U.S. at 413,The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable." *See id.* at 408-10; *see also Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003); *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir. 2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable.").

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir.) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), *cert. denied sub nom. Parsad v. Fischer*, 540 U.S. 1091, 124 S.Ct. 962 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041 (2003).

## IV.    The "Adequate and Independent State Ground" Doctrine and Procedural Default

Where a state court rejects a petitioner's claim because the petitioner failed to comply with a state procedural rule, the procedural default constitutes an adequate and independent ground for the state court decision. *See, e.g.*, *Coleman*, 501 U.S. at 729-30, 749-50. "[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir.1990) (*per curiam*).

Although procedurally defaulted claims are deemed exhausted for habeas purposes, a procedural default will "bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Harris v. Reed*, 489 U.S. 255, 262 (1989) (citations omitted); *accord Dretke v. Haley*, 541 U.S.

386, 393 (2004); *Coleman*, 501 U.S. at 749-50; *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995); *see also Harris*, 489 U.S. at 264 n. 10 ("[A]s long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent state ground doctrine "curtails reconsideration of the federal issue on federal habeas.").

## V.    Analysis of the Petition

### A.    Ground One: Erroneous Admission of Co-Defendant Gaines' Statement and Erroneous Limiting Instruction to the Jury

#### 1.    Overview of Ground One

As a major part of the apparent defense strategy, trial counsel sought to have the jury hear statements made by Gaines at his earlier trial on the same charges, exonerating petitioner of any involvement in the attempted robbery and shooting, and instead implicating Latson (a/k/a Gillie or Gillette or Gillet).[9]   To that end, defense counsel subpoenaed Gaines as a witness at Scott's trial, but Gaines, through counsel, asserted his Fifth Amendment privilege against self-incrimination and refused to testify. Trial counsel for petitioner then sought, over the prosecutor's objection, to introduce the transcript of Gaines' trial testimony instead pursuant to C.P.L. § 670.10.   Section 670.10(1) provides, in full, as follows:

> Under circumstances prescribed in this article, testimony given by a witness at (a) a trial of an accusatory instrument, or (b) a hearing upon a felony complaint conducted pursuant to section 180.60, or (c) an examination of such witness conditionally, conducted pursuant to article six hundred sixty, may, where

---

[9]        The entirety of Gaines' testimony (direct and cross-examination) was read into the record at Scott's trial, but it was not transcribed again. Although the transcript from Gaines' trial, or a copy thereof, apparently was introduced as a trial exhibit at Scott's trial, it was not included by respondent in the state court records provided as required under Rule 5 of the Rules Governing Habeas Corpus Cases Under Section 2254 . Therefore, there was no record in the file provided to this Court's request of what Scott's jury actually heard of Gaines' testimony. At this Court's direction, respondent eventually submitted the original transcript from Gaines' trial.

otherwise admissible, be received into evidence at a *subsequent proceeding in or relating to the action involved* when at the time of such subsequent proceeding the witness is unable to attend the same by reason of death, illness or *incapacity*, or cannot with due diligence be found, or is outside the state or in federal custody and cannot with due diligence be brought before the court. Upon being received into evidence, such testimony may be read and any videotape or photographic recording thereof played. Where any recording is received into evidence, the stenographic transcript of that examination shall also be received.

N.Y. CRIM. PROC. L. § 670.10(1) (emphases supplied). C.P.L. § 670.10(2) expressly provides that "[t]he subsequent proceedings at which such testimony may be received in evidence consist of:

> (a) Any proceeding constituting a part of a criminal action based upon the charge or charges which were pending against the defendant at the time of the witness's testimony and to which such testimony related; and
>
> (b) Any post-judgment proceeding in which a judgment of conviction upon a charge specified in paragraph (a) is challenged."

N.Y. CRIM. PROC. LAW § 670.10(2). The assistant district attorney argued strenuously that Gaines' prior testimony "should not be allowed in any respect; not as to excerpted portions, not in its entirety. T.617. In particular, the prosecutor argued that C.P.L. § 670.10 did not apply because Scott's trial did not qualify as a "subsequent proceeding" because, although it concerned the same charges faced by Gaines, it was a wholly separate proceeding. *See* N.Y. CRIM. PROC. LAW § 670.10(2) (expressly limiting he "subsequent proceedings [referred to in C.P.L. § 670.10(1)] at which such testimony may be received in evidence"). The prosecution maintained, on direct appeal, that "[i]t is not entirely clear that admission of Gaines' testimony . . . was proper[,]" Peo. App. Br. at 4, Resp't Ex. G at 49 (citing N.Y. CRIM. PROC. L. § 670.10(2)(a); *People v. Concepion*, 228 A.D.2d 204, 205 (App. Div. 1st Dept. 1996)). The reported cases in

New York are fairly uniform in supporting the proposition that Gaines was in effect

"incapacitated" by virtue of his invocation of his Constitutional right against self-incrimination.

The prosecutor's main argument was that petitioner's trial does not constitute a "subsequent

proceeding *in or relating to* the action involved," since the "action involved" was Gaines' earlier

trial; according to the prosecutor, Scott's separate trial does not "constitut[e] a part of [the]

criminal action" involving Gaines. As the prosecutor pointed out, the reported cases involving

C.P.L. § 670.10 deal with situations in which a defendant is be re-tried; the Court has been

unable to find cases specifically discussing the situation presented here–where two defendants

have been indicted in the same indictment but then obtain a severance and proceed to trial

separately. However, based upon a review of the common law decisions of which C.P.L. §

670.10 is a codification, and Federal Rule of Evidence 804, the Court does not find that the trial

court committed clear error in introducing Gaines' testimony under that statutory section.

As several New York courts have observed, "[a] traditional hearsay exception for prior

testimony of an unavailable witness (*see*, *Barber v. Page*, 390 U.S. [at] 722 . . .) is codified in

[N.Y. Crim. Proc. L.] 670.10 . . . ." *People v. Muccia*, 139 A.D.2d 838, 839, 527 N.Y.S.2d 620,

621 (App. Div. 3d Dept. 1988). In *Barber v. Page*, the Supreme Court explained,

> [T]here has traditionally been an exception to the confrontation requirement
> where a witness is unavailable and has given testimony at previous judicial
> proceedings against the same defendant which was subject to cross-examination
> by that defendant. *E.g.*, *Mattox v. United States*, *supra* (witnesses who testified in
> original trial died prior to the second trial). This exception has been explained as
> arising from necessity and has been justified on the ground that the right of
> cross-examination initially afforded provides substantial compliance with the
> purposes behind the confrontation requirement. *See* 5 Wigmore, Evidence ss
> 1395-1396, 1402 (3d ed. 1940); C. McCormick, Evidence §§ 231, 234 (1954).

*Barber v. Page*, 390 U.S. 719, 722 (1968); *accord Carracedo v. Artuz*, 81 Fed. Appx. 741, 744, 2003 WL 22055115, at *3 (2d Cir. Sept. 8, 2003). This Court reads of N.Y. CRIM. PROC. LAW § 670.10(1) and (2) to suggest that the legislative intent behind the statute is similar to that underpinning Rule 804(b)(1) of the Federal Rules of Evidence regarding the admissibility of former testimony. F.R.E. 804(b)(1) sets out, as a hearsay exception, "[t]estimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with the law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. FED. R. EVID. 804(b)(1). The annotations to Rule 804(b)(1) state that "[t]he common law did not limit the admissibility of former testimony to that given in a earlier trial of the same case, although it did require identity of issues as a means of insuring that the former handling of the witness was the equivalent of what would now be done if the opportunity were presented." Advisory Committee's Note to Exception (1) of Federal Rule of Evidence 804(b)(1) (West 2009) (Revised Ed.). Clearly, the prosecution had "an opportunity and similar motive" in his handling of Gaines as a witness at Gaines' own murder trial to enable the prosecutor to sufficiently test Gaines' story about his statement to the police inculpating Scott and his subsequent testimony exonerating him. Thus, the Court is satisfied that the former testimony of Gaines, offered in the trial of Scott, although hearsay, was admissible as former testimony within the meaning of N.Y. CRIM. PROC. L. § 670.10(1) and (2).

The Court next turns to the trial judge's ruling regarding the admissibility of the Gaines' written and oral statements at a proceeding other than his own trial. On this point, the trial judge

stated:

> The Court's going to – assuming that [Gaines] invokes his Fifth Amendment privilege, the Court finds that he can – if his matter went up on appeal and was reversed on a new trial and he did not take the stand at that time, exercising his Fifth Amendment privileges is permissible. And the Court's going to, pursuant to People versus Varsos, [182 A.D.2d 508, 582 N.Y.S.2d 193 (App. Div. 1st Dept. 1992)][10] admit the testimony of Mr. Glaston Gaines from the prior trial to be read, after the transcript of that trial has been gone over by both prosecution and the defense counsel.
>
> It adds one additional problem to the trial. That statement made in court, if I recall it correctly, is inconsistent to his statement that he gave to the police after his rights had been read. It's the feeling of the Court under the rule of completeness that if the defense counsel reads in his testimony, then that [sic] statement should be permitted as a rebuttal statement, an inconsistent statement. I don't think the defense can have it both ways. All right? Exception noted to everybody.

T.623.  The proceedings then resumed before the jury. *Id.* This Court does not agree with the trial court that the admission of Gaines' written statement was necessary. Given the extensive and minutely detailed cross-examination the conducted of Gaines at his earlier trial, the "completeness" the trial court sought to provide was already present in the Gaines' admissible trial transcript, and there was no need or reason to allow the admission of the Gaines police statement in Scott's trial to supply "completeness."

When the time came for Gaines' testimony to be read into the record, the prosecutor noted that the trial judge had "ruled earlier that it would allow the transcript of Glaston Gaines' testimony but also that the statement of Glaston Gaines' would also be put in so that the jury had a context. And *it's my understanding the defense has no objection to that*. . . ." T.740 (emphasis

---

[10]    "The trial court properly admitted the sworn testimony of the shooter, given at defendant's first trial herein which terminated with a hung jury, on the ground that the refusal of this witness to testify at the instant trial, based upon his Fifth Amendment privilege, rendered him an "unavailable" witness within the meaning of CPL 670.10[.]" *People v. Varsos*, 182 A.D.2d at 509 (citing *People v. Brown*, 26 N.Y.2d 88, 93 (N.Y. 1970).

supplied). Defense counsel did not disagree. *See id.* The prosecutor then asked to have the statement published to the jury prior to the transcript being read, but the trial court, noting that "ordinarily that statement couldn't come in but it does come in as an inconsistent statement [with regard] to the testimony that's going to be read to the jury." T.741. The court determined that the proper time to admit the statement was in rebuttal. T.741 (The Court: "Keep it in order because if [the written statement] comes in before that and this goes up to the Appellate Division, if it comes in out of order then they may argue imprudence or a situation [sic] and it's coming in more as a completeness doctrine [sic].") T.741.

      2.      **The Appellate Division's Holding and Procedural Default Due to the Reliance Upon an Adequate and Independent State Ground\**

The Appellate Division rejected petitioner's claims concerning Gaines' written and oral statements as follows:

> By failing to object to the admission of Gaines' statement, defendant failed to preserve for our review his present contention that the statement was improperly admitted (*see*, CPL 470.05(2)). In any event, even assuming, *arguendo*, that the statement was improperly admitted, we conclude that any error is harmless. Defense counsel read into the record the transcript of the cross-examination of Gaines during his trial, which contained a recitation of Gaines' statement.

*People v. Scott*, 262 A.D.2d at 1022. Respondent argues that the Appellate Division relied upon an adequate and independent state ground, namely, C.P.L. § 470.05(2),[11] in disposing of both the claim regarding the improper admission of the statement as well as the claim challenging the adequacy of the trial court's limiting instructions. Resp't Mem. at 2 (citing *Wainwright v. Sykes*,

---

[11]     "For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. . . ." N.Y. CRIM. PROC. LAW § 470.05(2)).

433 U.S. 72 (1977); *Harris v. Reed*, 489 U.S. 255, 261-62 (1989)). As the Second Circuit pointed out in *Green v. Travis*, 414 F.3d 288 (2d Cir.2005), it is well-settled New York law that "[u]nder [C.P.L.] § 470.05(2) , an objection to a ruling or instruction of a criminal court must be raised contemporaneously with the challenged ruling or instruction in order to preserve the objection for appellate review." 414 F.3d at 294.

I agree with respondent that the Appellate Division's statement that Scott's claim concerning Gaines' written statement was "unpreserved" was sufficient to establish that it was relying on a procedural bar as an independent ground in disposing of the issue. *See Harris*, 489 U.S. at 265 n. 12. The fact that the New York Court of Appeals subsequently issued a summary denial of leave to appeal does not change the analysis, because where "the last reasoned opinion on the claim explicitly imposes a procedural default"–as is true of the Appellate Division's decision in this case–federal habeas court "will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *accord Rodriguez v. Schriver*, 392 F.3d 505, 511 n. 10 (2d Cir.2004). Thus, the procedural default relied upon by the Appellate Division constituted an "independent" state law ground for its decision

The remaining question is "whether the state ground relied upon is 'adequate' to preclude federal habeas review." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir.1999). "[A] procedural bar will be deemed 'adequate' only if it is based on a rule that is 'firmly established and regularly followed' by the state in question." *Garcia*, 188 F.3d at 77 (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). Whether the state courts' application of the procedural rule is " 'firmly established and regularly followed'" must be judged in the context of "the specific

circumstances presented in the case" and "the asserted state interest in applying the procedural rule in such circumstances." *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir.2003) (quoting *Lee v. Kemna,* 534 U.S. 362, 386-87 (2002) (quotation marks omitted). The Second Circuit discerned in *Lee v. Kemna* three "guideposts" for making the "adequacy" determination:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto*, 331 F.3d at 77 (quoting *Lee*, 534 U.S. at 381-85).

The first *Cotto* guidepost is not relevant here because "the lack of objection by a party would not, almost by definition, be mentioned by the trial court." *Monroe v. Kuhlman*, 433 F.3d 236, 242 (2d Cir.2006) (internal quotation marks omitted). In any event, the lack of objection was "relied upon" by the trial court in the sense that, had a proper objection or request for a limiting instruction been made, it would have allowed the trial court to review and weigh Scott's claim.

The second guidepost weighs in favor of a finding of adequacy, since both New York's statutory and case law are clear that petitioner was required to object to the introduction of the evidence and to request a limiting instruction to preserve the issues for appeal. *See* N.Y. Crim. Proc. Law § 470.05(2); *People v. Santiago*, 52 N.Y.2d 865, 866 (N.Y. 1981) (holding that the failure to make "an application seeking further or more complete instructions" precluded defendant from "assert[ing] the inadequacy of such instructions as error on appeal"); *People v.*

*McClain*, 250 A.D.2d 871, 873 (App. Div. 3d Dept. 1998) (holding that defendant's failure to

lodge contemporaneous objections precluded further appellate review of his challenges to the

trial court's limiting instruction to the jury). Therefore, it appears clear that in these "specific

circumstances," New York case law required petitioner to object to the introduction of Gaines'

written and oral statements at the time of trial. *Accord*, *e.g.*, *Torres v. Girdich*, No. 04 Civ.

1512(GWG), 2006 WL 1230328, at *9 (S.D.N.Y. May 9, 2006)) ("Both statutory and case law

are clear that Torres was required to object to the relevant evidence contemporaneously and to

request a limiting instruction to preserve the issues for appeal. See CPL § 470.05(2); People v.

Grant, 186 A.D.2d 267, 267 (2d Dep't 1992) (requiring a "contemporaneous objection to [a] line

of questioning" in order to preserve a claim for appellate review); People v. Santiago, 52 N.Y.2d

865, 866 (1981) (failure to make "an application seeking further or more complete instructions"

precluded defendant from "assert[ing] the inadequacy of such instructions as error on appeal");

*People v. McClain*, 250 A.D.2d 871, 873 (App. Div. 3d Dept. 1998) (defendant's failure to enter

contemporaneous objections precluded further appellate review of challenges to limiting

instruction). This Court is unaware of any exception to the contemporaneous objection rule

where a judge is eliciting the allegedly objectionable testimony. *See generally People v. Smith*,

251 A.D.2d 226, 226-27 (1st Dep't 1998) (where party failed to object to judge's questioning,

issue was not preserved for review).").

     Turning to the third *Cotto* guidepost, the record cannot be construed as showing that

Scott's defense counsel "substantially complied" with the rule given "the realities of trial." *See*

*Torres*, 2006 WL 1230328, at *9 ("Because Torres failed to make a proper objection to the

testimony at issue and also failed to request a limiting instruction, the third guidepost does not

help him either. In other words, Torres cannot show that he "substantially complied" with the state rule requiring him to preserve his objection for appellate review."). Indeed, Scott brought a *pro se* C.P.L. § 440.10 motion arguing that trial counsel was ineffective for failing to object at the time that Gaines' statements were admitted, or otherwise seek to preclude their introduction into evidence.

Applying the three *Cotto* guideposts, it is clear that the Appellate Division could properly rely on C.P.L. § 470.05(2) because it is "firmly established and regularly followed," and thus constitutes an adequate state ground barring review of the merits of Scott's claim. *Accord*, *e.g.*, *Garcia v. Lewis*, 188 F.3d 71, 79-82 (2d Cir. 1999) (CPL § 470.05(2) constitutes an "adequate" state ground precluding habeas review) As a result, habeas review of Scott's original claim is unavailable unless (1) he can establish cause for his default and resulting prejudice, or (2) he can demonstrate that he is "actually innocent." *E.g.*, *St. Helen v. Senkowski*, 374 F.3d 181, 183-84 (2d Cir.2004) (citations omitted).

### 3. Whether the Procedural Default of Ground One May Be Excused on the Basis that Trial Counsel's Ineffectiveness in Failing to Object Supplies "Cause"and "Prejudice"

Attorney error may constitute "cause" excusing the procedural default if the error is so egregious that counsel's performance fails to satisfy the defendant's Sixth Amendment right to effective assistance of counsel. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)). While ineffective assistance of counsel may constitute a cause for procedural default, the exhaustion doctrine "requires that a claim of ineffective assistance be presented to state courts as an independent claim before it may be used to establish cause for a procedural default" in the context of a petition for a federal writ of habeas corpus.

*Murray*, 477 U.S. at 489. Thus, to claim that attorney error excuses a procedural default, a habeas petitioner must either have properly presented and exhausted an ineffective assistance of counsel claim in the state courts or, if the ineffective assistance of counsel claim is itself procedurally barred, separately show that there is "cause" excusing said procedural default as well as prejudice resulting from the error. See 529 U.S. at 453.

Construing Scott's *pro se* petition liberally, *see Williams v. Kullman*, 722 F.2d 1048, 1050-51 (2d Cir.1983), I read it as asserting that trial counsel's failure to object amounted to ineffective assistance and therefore constitutes "cause" to excuse the procedural default. As noted above, in his C.P.L. § 440.10 motion, Scott asserted a claim of ineffective assistance of trial counsel based, in part, on counsel's failure to object to Gaines' written statement. Notwithstanding the motion court's failure to have explained its reasoning process in denying Scott's C.P.L. § 440.10 motion, its summary denial of the claims without reference to any state or federal case law[12] counts, in this case, as an adjudication of the merits for AEDPA purposes. *See Sellan v. Kuhlman*, 261 F.3d 303, 311-12 (2d Cir. 2001).

Under *Strickland*, to demonstrate ineffective assistance of counsel, a habeas petitioner

---

[12]    The New York state law standard for judging ineffective assistance of trial counsel claims is set forth in *People v. Baldi*, 54 N.Y.2d 137 (N.Y.1981): An ineffective assistance of counsel claim will be denied "so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation." *Baldi*, 54 N.Y.2d at 147. Under *Strickland*, when counsel's performance is determined to be constitutionally deficient, an ineffective assistance of counsel claim is established if there is a "reasonable probability" the outcome would have been different. *Strickland*, 466 U.S. at 687. Thus, under *Strickland*, the prejudice inquiry places the focuses on the probability of a more favorable verdict for the defendant while, to the extent that the New York standard considers the prejudicial effect of counsel's errors, it looks at the "fairness of the process as a whole rather than [any] particular impact on the outcome of the case." *People v. Benevento*, 91 N.Y.2d 708, 714 (N.Y.1998). *See, e.g.*, *Henry v. Poole*, 409 F.3d 48, 69 (2d Cir. 2005) (comparing the *Strickland* and *Baldi* standards). It is unclear whether the state court in this case applied *Baldi*, *Strickland*, both standards, or neither standard. This Court thus will proceed conservatively and review the ineffective assistance of counsel claim brought in the C.P.L. § 440.10 motion *de novo. See Maxwell v. Greiner*, No. 04-CV-4477 (CBA), 2008 WL 2039528, at *8 (E.D.N.Y. May 12, 2008).

must show both that his trial counsel's performance was so deficient that it can be said that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment, and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In other words, Scott must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result of the trial would have been different. The Supreme Court instructed in *Strickland* that "[j]udicial scrutiny of counsel's performance must be highly deferential[,]" for "]i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. Fairly assessing a trial attorney's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" as "[t]here are countless ways to provide effective assistance in any given case[,]" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* Similarly, the New York Court of Appeals has cautioned reviewing courts to "avoid confusing 'true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis[.]'" *People v. Benevento*, 91 N.Y.2d 708, 712 (N.Y. 1998) (quoting *People v. Baldi*, 54 N.Y.2d 137, 146 (N.Y. 1981)).

This Court has reviewed (1) the trial transcript of Scott's trial in its entirety, (2) Gaines' written statement which was provided in Respondent's Appendix Exhibits, and (3) Gaines' testimony from Gaines' earlier trial, which this Court requested that respondent provide. I note

that Gaines' written statement was not read into the record during Gaines' direct examination at his trial. Rather, on cross-examination, the prosecutor questioned Gaines about his motive in making the statement; Gaines claimed that his written statement to the police did not reflect the entire truth, and that he had told a falsehood (i.e., accusing Scott) in order to protect his friend Latson, a/k/a Gillette. *See* Transcript of Gaines' Trial ("Gaines Tr.")[13] at 962 *et seq.* The prosecutor then reviewed the written statement.[14] with Gaines, essentially sentence by sentence, and asked Gaines whether each statement therein was true or false:

> Q. "'M' came outside and started talking with me."
> A. False, not true.
> Q. "'M' asked me if I wanted to make some money." That's not true?
> A. Not true.
> Q. That was Ladson [sic] who did that?
> A. Ladson [sic] didn't ask if I wanted to make any money, no.
> Q. "I said yeah." That's true?
> A. Pertaining to that is written in this paper, no, I did not say that to him.
> Q. "I asked him how?" Did that happen?
> A. That's false.
> Q. "He [i.e., 'M'] said that there was a kid up in the house with a 2G package."
> A. That's false.
> . . .
> Q. "I asked 'M' if he had a tool, because I didn't have one."
> A. False.
> Q. "He told me to hold on."
> A. False.
> Q. "'M' went back through the cut, but I couldn't see if he went into the house or kept on going towards Weeger Street."
> A. False.
> Q. "'M' came back about an hour later and handed me a black .380 semi-automatic gun."
> A. False.

---

[13] The defense theory at Gaines' trial was that his cocaine use that night and his overall chemical dependency were so extremely severe that he was unable to form the requisite criminal intent to rob and shoot Poochie. *See, e.g.*, Gaines Tr. at 998 (defense counsel's summation).

[14] Gaines' written statement has been reproduced in this Decision and Order, *supra*, at Section II.B.

-43-

Q.     Did you get a semi-automatic .380?

A.     True.

Q.     "I don't know what kind it was."

A.     I did say that, true.

Q.     "'M' just gave me the gun and told me to take the kid into the bathroom and do it."

A.     False.

Q.     False as far as "M" telling you that, but that was the plan deemed by Anthony [Latson] and Tony [last name unknown]?

A.     True.

Q.     Did you say that to the police even though "M" didn't tell you that?

A.     I said it, yes, but the names of the people are different.

Q.     So when you are saying "false," it's not necessarily false, not the case that you didn't say that to the police. It is a false statement that you made you mean?

A.     True.

Q.     "After that 'M' went back into the house."

A.     False.

Q.     "I waited about fifteen minutes and went into 'M's' house."

A.     False.

Q.     "I bought a couple of sacks [of cocaine] from a young kid inside."

A.     True.

Q.     "There was about eight people inside and t hey were calling this kid 'Poochie'."

A.     True.

Q.     "The only people in there that I knew were 'M' and a kid whose brother went to school with me a long time ago."

A.     True.

Q.     "I just hung out getting high in M.'s house for while."

A.     True.

Q.     "After a while my friend Gillette came to the door and knocked."

A.     True.

Q.     "'M' answered the door and let Gillette in."

A.     True.

Q.     Why did you involve Gillette at all? You wanted to protect him. Why did you mention him at all?

A.     Because I was kind of–he was from around the neighborhood, basically everybody knew him. He came up and he said something to me and if you keep reading you'll hear me say that Gillette came up to me and said, "Don't do it, kid. Don't do it."

Q.     Wouldn't it have been easier to keep Gillette out of it?

A.     No, because his name was already mentioned.

Q.     The police were not telling you about Gillette being involved in this yet.

A.      Yes, they did.

Q.      You are sure of that?

A.      Yes, I'm positive.

Q.      You wanted to minimize Gillette's role?

A.      As when I first got upstairs they were saying that they knew what happened, that would me, Gillette and all the others, you know what I'm saying? They was already telling me basically what they knew, that they didn't have Tony in the mix of it, but had me and Gillette.

Q.      Let's go on. "M answered the door and let Gillette in"

A.      True.

Q.      "Gillette came in and walked up to me and told me not to do it."

A.      Yes, true.

Q.      "I don't know how he knew what I was going to do, but he just kept saying, don't do it, kid. Don't do it."

A.      Saying it's true, but he didn't say that, that's what I told the police.

Q.      I appreciate that. "I just said to Gillette, don't worry, I'll see you outside."

A.      False.

Q.      "Gillette kept saying don't do it, kid. But I had the gun in my dark blue hoody and I just took it out and pointed it at the kid they called 'Poochie.'"

A.      I said I pulled it out of my hoody. I said I pointed it, but I don't really remember me pulling it out.

Q.      Okay. So you do remember pulling it out, but you don't remember pointing it?

A.      No.

Q.      "I told the kid to break himself."

A.      I don't basically know what I said. I might have said, "yourself". I might have said, "what's up?" I might have said that, I don't know.

Q.      That meant to give you the money, right, "break yourself"?

A.      "Break yourself", do mean, give up the money, yes.

Q.      Okay. Just like I'm going to "bust you", means I will shoot you.

A.      True.

Q.      "Then all of a sudden the gun started going off." That's what you describe here, though. Did you tell the police that?

A.      True, I did tell the police that.

Q.      Is it accurate?

A.      To the statement, yes.

Q.      "It went off about four or five times." That's accurate?

A.      I recall it going off.

Q.      And you told the police that?

A.      Yes, I did.

Q.      "I do not remember shooting the kid, I just remember the gun going off."

A.      True.

Q.      "After that I turned around and went downstairs and went over to the

|   | fence." That's what you said today. Is that true? |
|---|---|
| A. | True |
| Q. | "I dropped the gun by the fence climbed the fence and ran through some streets to upper falls, from there are ran over today's street, then Niagara. |
| A. | To the part where he jumped the fence. |
| Q. | Right. |
| A. | Is true. The part where I dropped the gun is false and everything else basically is true, I did run, jump the fence and runned over to Niagara and Bay streets and that, yes, I did. |

. . .

| Q. | And the parts that are false that we just went through, sir, are false parts because of things that you said to the police and that got into your statements which are untrue, isn't that right? |
|---|---|
| A. | True. |
| Q. | So any falsities on the statement is due to you telling the police-- |
| A. | I'm not, I'm not denying that. |
| Q. | Okay, sir. But now today we are hearing the whole truth because you no longer want to protect Ladson [sic]? |
| A. | It's not like–it's like I tried to protect him, but it didn't do any good because he ended up killing someone else. |
| Q. | He is in jail on another murder already, isn't he? |
| A. | Yes, two weeks after. |
| Q. | And you are disappointed with him [Latson] for that? |
| A. | Yes.. |
| Q. | And you went out on a limb trying to protect him? |
| A. | True |
| Q. | And now that you are disappointed you might as well tell the truth for the first time? |
| A. | Mr. Heuther– |
| Q. | Is that true or not? |
| A. | Yes, sir. |
| Q. | You are an admitted liar. We started with that, didn't we? |
| A. | In your sight, I am, sir. |
| Q. | I'm asking you, you admit that you lied to the police on a number of occasions? |
| A. | Yes. |

Thus, on cross-examination, Gaines admitted to essentially all of the allegations in his written statement. He disavowed only those portions of the statement in which he accused Scott (i.e., "M") of being the instigator of the plan to rob Poochie. *See* Gaines Tr. at 974 *et seq.*

Following the reading of Gaines' trial testimony into the record, the trial court allowed the prosecution to call a rebuttal witness, Investigator Schultz, the police officer who had interviewed Gaines. Investigator Schultz first testified regarding his interview with Gaines in October 1994, just after the shooting. When the prosecutor asked Investigator Schultz to read Gaines' written statement to the jury, defense counsel objected on the basis that to do so would be redundant, since Gaines' written statement had already been introduced as a trial exhibit by the prosecution. The trial court overruled the objection.

### a.)     The "Deficient Performance" Prong

When considering a claim of ineffective assistance of counsel based on tactical decisions "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. at 689. Thus, courts are instructed not to second guess an attorney's trial strategy and tactics. *Goodson v. United States*, 564 F.2d 1071, 1072 (4th Cir.1977); *Stamper v. Muncie*, 844 F.2d 170 (4th Cir.1991). As an initial matter, I note that prior to trial, Scott moved for and obtained a severance, presumably under *Bruton v. United States*, 391 U.S. 123 (1968); *Cruz v. New York*, 481 U.S. 186 (1987), to avoid prejudice from the receipt of admissions by Gaines that implicated him. In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that a defendant may be deprived of his Sixth Amendment Confrontation Clause rights when the government introduces the confession of a non-testifying co-defendant in

a joint trial.[15] The Supreme Court has also held that "the admission of a nontestifying accomplice's confession, which shifted responsibility and implicated the defendant as the triggerman, 'plainly denied [the defendant] the right of cross-examination secured by the Confrontation Clause.' " *Lilly v. Virginia*, 527 U.S. 116, 131 (1999) (quoting *Douglas v. Alabama*, 380 U.S. 415, 419 (1965)); *see also Crawford v. Washington*, 541 U.S. 36 (2004). To implicate a defendant's rights under the Confrontation Clause, an accomplice's confession, which is used at trial, must be "directly and powerfully incriminating." *Gray*, 523 U.S. at 190-92 (discussing *Bruton,* 391 U.S. 123, *supra*, and *Richardson v. Marsh*, 481 U.S. 200 (1987)).

Thus, having obtained a severance, it would seem that a viable objection against the admission of Gaines' written confession could have been lodged by trial counsel based on the hearsay rule and *Bruton v. United States*, 391 U.S. 123 (1968). *Cf. Henry v. Scully*, 918 F. Supp. 693, 714 (S.D.N.Y. 1995) (where petitioner's co-defendant took the stand and testified at their joint trial, petitioner could not have prevented the evidence as to co-defendant's confession from being before the jury) (citing *Nelson v. O'Neil*, 402 U.S. 622 (1971); *United States ex rel. Pugach v. Mancusi*, 441 F.2d 1073, 1075 (2d Cir.), *cert. denied*, 404 U.S. 849 (1971); *People v. Payne*, 35 N.Y.2d 22, 358 N.Y.S.2d 701, 315 N.E.2d 762 (1974); *People v. Diaz*, 161 A.D.2d 789, 790, 556 N.Y.S.2d 128 (2d Dept.), *lv. denied*, 76 N.Y.2d 855, 560 N.Y.S.2d 995, 561 N.E.2d 895 (N.Y. 1990).

---

[15]     "*Bruton* involved two defendants accused of participating in the same crime and tried jointly before the same jury. One of the defendants had confessed. His confession named and incriminated the other defendant. The trial judge issued a limiting instruction, telling the jury that it should consider the confession as evidence only against the codefendant who had confessed and not against the defendant named in the confession. *Bruton* held that, despite the limiting instruction, the Constitution forbids the use of such a confession in the joint trial." *Gray v. Maryland*, 523 U.S. 185, 188 (1998).

Trial counsel had a difficult task in overcoming the petitioner's own statements, in which he confessed to orchestrating the robbery of Pookie, during which robbery Pookie was fatally shot–essentially, he admitted to felony murder. Trial counsel somehow had to convince the jury that Scott had nothing to do with the robbery apart from the fact that it occurred at his apartment. In a rather unusual turn of events, the shooter, Gaines, made statements under oath at his separate trial that completely exonerated Scott rather than implicating him in the crime. It was eminently reasonable for defense counsel to seek to place Gaines' trial testimony before the jury at Scott's trial. Indeed, it did not appear that he had any better options. This strategy, however, did not come without a price. Trial counsel had to know that if Gaines' exonerating direct testimony were introduced, at the very least, the cross-examination of Gaines would be introduced as well.

Respondent suggested on direct appeal that "[t]he most likely reason" for trial counsel's failure to object, and express concession, was that "the substance of [Gaines'] statement was addressed in detail during Gaines' trial testimony, which[,] as noted[,] was introduced at defendant's behest." People's Appellate Brief ("Peo. App. Br.") at 5, Resp't Ex. G at 50. Respondent argued that the "separate admission of the statement . . . was essentially cumulative (and basically redundant)[,]" and "in any event defendant [was] hardly in a position to allege prejudicial error in this regard," *id.*, since as respondent maintained, Gaines' trial testimony should not have been admitted under C.P.L. § 670.10. Respondent suggests that trial counsel had no reason to object to the admission of Gaines' written statement because if he did object, it would have been overruled. In respondent's view, the written statement was "cumulative" to and "redundant" of the substance of Gaines' trial testimony wherein the prosecutor reviewed the statement with him sentence by sentence. *See id.* Indeed, the Appellate Division relied upon the

-49-

cumulativeness of the statement compared with Gaines' cross-examination testimony to find that any error in its admission was harmless.

In this Court's opinion, respondent's own argument supports the conclusion that it was error for the trial court to allow introduction into evidence of the written statement. Where evidence is cumulative or redundant, it may be excluded by the trial court. *See, e.g.*, *In re Integrated Resources, Inc.*, 147 B.R. 650, 664 (S.D.N.Y. 1992) (" If a court finds that evidence is cumulative or redundant, it can use its discretion to exclude it.") (citing *International Halliwell Mines, Ltd. v. Continental Copper & Steel Indus., Inc.*, 544 F.2d 105, 109 (2d Cir.1976)); *Gierlinger v. Gleason*, 160 F.3d 858, 871 (2d Cir. 1998) ("The trial court has considerable discretion in determining whether to admit or exclude evidence, *see, e.g.*, *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir.1997); *Healey v. Chelsea Resources, Ltd.*, 947 F.2d 611, 619 (2d Cir.1991), and to exclude even relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice or confusion, or by its cumulative nature, *see* FED. R. EVID. 403.").

Similarly, as a matter of New York state evidentiary law,  "[t]he trial court has discretion to admit or preclude relevant evidence based on an analysis of its probative value versus whether it confuses the main issues and misleads the jury (*see People v. Davis*, 43 N.Y.2d 17, 27, 400 N.Y.S.2d 735, 371 N.E.2d 456 (1977) ("even if the evidence is proximately relevant, it may be rejected if its probative value is outweighed by the danger that its admission would prolong the trial to an unreasonable extent without any corresponding advantage (e.g., where cumulative evidence is proffered); or would confuse the main issue and mislead the jury; or unfairly surprise a party; or create substantial danger of undue prejudice to one of the parties"); *People v. Corby*, 6

N.Y.3d 231, 234-235, 811 N.Y.S.2d 613, 844 N.E.2d 1135 (2005); Prince, Richardson on Evidence § 4-103 (Farrell 11th ed.)).” *People v. Petty*, 7 N.Y.3d 277, 285 (N.Y. 2006).

Indeed, trial counsel did make an objection on the basis of cumulativeness when Investigator Schultz read Gaines' written statement for the jury on rebuttal. If he was going to make an objection on cumulativeness grounds, he should have done so at the time when the prosecutor introduced the written statement as a trial exhibit.  Furthermore, in this Court's opinion, the evidentiary “doctrine of completeness or “rule of completeness” referred to by the trial judge was not applicable to the circumstances presented by the introduction of Gaines' written statement to the police.

In the federal context, the “completeness doctrine” is contained in Rule 106 of the Federal Rules of Evidence, which  provides that “[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.” FED. R. EVID. 106. Under this principle, an “omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.” *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir.), *cert. denied*, 484 U.S. 844 (1987) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172-73 (1988); *Phoenix Associates III v. Stone*, 60 F.3d 95, 102 (2d Cir. 1995)). The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages. *Id.* (citing *United States v. Marin*, 669 F.2d 73, 84 (2d Cir.1982)). The Second Circuit has “ interpreted Rule 106 to justify the admission of

previously excluded portions of partially received documents or statements only when necessary to explain the admitted portion, to place it into context, to ensure a fair and impartial understanding of the admitted portion, or to correct a misleading impression that might arise from excluding it." *United States v. Johnson*, 61 F.3d 131, 136 (2d Cir. 1995) (citing *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir.), *cert. denied*, 484 U.S. 844 (1987); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982); *United States v. Weisman*, 624 F.2d 1118, 1128 (2d Cir.), *cert. denied*, 449 U.S. 871 (1980)).

""[T]he rule of completeness is violated 'only where admission of the statement in redacted form distorts its meaning or excludes information substantially exculpatory of the declarant.'" *United States v. Yousef*, 327 F.3d 56, 154 (2d Cir. 2003) (quoting *United States v. Benitez*, 920 F.2d 1080, 1086-87 (2d Cir.1990)). "The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *Johnson*, 507 F.3d at 796 (quoting *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999), *vacated on other grounds*, 196 F.3d 383 (2d Cir. 1999), *cert. denied*, 530 U.S. 1267 (2000))." *United States v. Harper*, 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009)). "While Rule 106 applies only to writings, we have previously explained that the rule of completeness is "substantially applicable to oral testimony, as well" by virtue of Fed.R.Evid. 611(a), which obligates the court to "make the interrogation and presentation effective for the ascertainment of the truth." *United States v. Alvarado*, 882 F.2d 645, 650 n. 5 (2d Cir.), *cert. denied*, 493 U.S. 1071 (1989)." *United States v. Mussaleen*, 35 F.3d 692, 696 (2d Cir. 1994). "In deciding whether to redact portions of a defendant's statement, a district court balances the interest in protecting a co-defendant's confrontation right against the judicial economy promoted

by conducting a joint trial." *Id.* (citing *United States v. Castro*, 813 F.2d 571, 576 (2d Cir.), *cert. denied*, 484 U.S. 844 (1987)).

New York does not have an evidentiary code; the rule of completeness is contained in common law decisions such as *People v. Dlugash*, 41 N.Y.2d 725, 736 (N.Y. 1977) ("Certainly, it is true that the defendant was entitled to have the entirety of the admissions, both the inculpatory and the exculpatory portions, placed in evidence before the trier of facts.") (citing *People v. La Belle*, 18 N.Y.2d 405, 410-411; *People v. Gallo*, 12 N.Y.2d 12, 15; Richardson, Evidence (10th ed.), § 227, p. 202.)); *accord People v. Hubrecht*, 2 A.D.3d 289, 289, 769 N.Y.S.2d 36, 37 (App. Div. 1st Dept. 2003) (holding that defendant's exculpatory hearsay statements were not admissible under the rule of completeness because "the three statements were made to different persons in different settings and could not be viewed as a single continuous narrative or process of interrogation") (citation omitted); *see also People v. Gallo*, 12 N.Y.2d 12, 16 (N.Y. 1962) ("The general nature of defendant's testimony on this subject was that he admitted making some of the replies, denied others, and as to still others said that he could not remember. Under the circumstances, fairness required that defendant's counsel be allowed to read into the record those parts of the statement in which defendant denied his guilt. This is so for another reason, also. The County Judge, as his ground for refusing to let defendant's attorney bring out the exculpatory parts of the statement, said it was not being offered as a confession. However, in his instructions to the jury the Judge described this same statement as 'a confession or what is tantamount to a confession'."); *People v. Walker*, 285 A.D.2d 364, 364 (App. Div. 1st Dept. 2001) ("The court properly exercised its discretion in permitting the People to introduce defendant's videotaped confession in which two references to the deceased having committed

robberies in the area were redacted. The redactions did not violate the rule of completeness. There was nothing exculpatory about the redacted matter, because, in context, it had no connection to defendant's justification defense, and it was not explanatory of the admitted portion of the statement[.]") (internal citations omitted).

Respondent argued, and the Appellate Division apparently agreed, that any error in admitting Gaines' written statement was rendered harmless because it was cumulative to Gaines' trial testimony. While this argument is logical and finds general support in the case law regarding how to judge the effect of erroneously admitted evidence, the Court cannot ignore the potential for the jury to misuse Gaines' statement declaring petitioner to be the mastermind behind the robbery. Obviously, Gaines' written statement posed a clear *Bruton* problem; that is the basis for petitioner's defense counsel having moved for a severance of his trial from Gaines' proceeding. Had Gaines and Scott been tried jointly, Gaines' confession could not have been introduced without running afoul of *Bruton*, even if a limiting instruction were to be issued. *See United States v. Bullock*, No. 1:06-CR-0120 (LEK), 2009 WL 1707363, at *5 (N.D.N.Y. June 17, 2009) ( In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that "a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 207 (1987) (discussing *Bruton* )). But, as discussed above, it appears that Scott's trial counsel made a calculated risk to waive Scott's *Bruton* rights in furtherance of the strategy of placing Gaines' helpful trial testimony before Scott's jury. The Second Circuit has held that "defense counsel may waive a defendant's Sixth Amendment right

to confrontation where the decision is one of trial tactics or strategy that might be considered sound." *United States v. Plitman*, 194 F.3d 59, 64 (2d Cir.1999). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733, (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). "The law is well established that if, 'as a tactical matter,' a party raises no objection to a purported error, such inaction 'constitutes a true waiver which will negate even plain error review.'" *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir.2007) (quoting *United States v. Kon Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir.1995)).

In *Plitman*, the defendant, who faced prosecution for tax evasion, was found to have waived his Confrontation Clause rights due to tactical decisions of his attorney. 194 F.3d at 61, 64. Plitman's defense attorney stipulated to the admission of a hearsay account of a conversation between an Internal Revenue Service agent and the president of defendant's employer, in an apparently strategic attempt to proceed to trial before the president would be available to testify. *Id.* at 62, 64. Thus, the "waiver" involved was defendant's stipulation to evidence through counsel. The Second Circuit explained,

> We have not decided specifically whether and under what circumstances defense counsel may waive a defendant's right to confrontation. Our opinion in *Brown v. Artuz* suggests that defense counsel may make the waiver where a stipulation involves trial strategy and tactics, even though the stipulation impacts on a defendant's constitutional rights. . . . Other circuit courts of appeals have held that "counsel in a criminal case may waive his client's Sixth Amendment right of confrontation by stipulating to the admission of evidence, so long as the defendant does not dissent from his attorney's decision, and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy." United States v. Stephens, 609 F.2d 230, 232-33 (5th Cir. 1980). . . .

*United States v. Plitman*, 194 F.3d at 63 (contrasting *Wilson v. Gray*, 345 F.2d 282, 287-88 & no.

7 (9th Cir.1965) (concluding that "a reviewing court can not find a denial of the constitutional right to cross-examination merely on the basis of an error in trial tactics unless the error is so gross as to constitute a denial of adequate and effective assistance of counsel"); *Cruzado v. Puerto Rico*, 210 F.2d 789, 791 (1st Cir. 1954) (similar), with *Clemmons v. Delo*, 124 F.3d 944, 956 (8th Cir. 1997) (stating that "the law seems to be clear that the right of confrontation is personal and fundamental and cannot be waived by counsel"),[16] *cert. denied*, 523 U.S. 1088 (1998)). The Second Circuit determined that the record facts in *Plitman* "clearly support[ed] [the trial judge]'s conclusion that defendant's waiver of Sixth Amendment rights through counsel was valid." As a result of his counsel's decision to allow the hearsay testimony, defendant Plitman "achieved several tactical advantages. . . [t]hose advantages included a quicker trial date, limitations on [the president's] testimony, and the opportunity to attack the accuracy of [the agent's] notes and recollection of the hearsay conversation." *Id.* at 64. Thus, the Second Circuit found "Plitman's challenges to the prudence of the tactical decision [to be] unavailing." *Id.* The Second Circuit held that "Plitman suffered no loss of his Sixth Amendment confrontation rights and that it was not plain error for the district court to have accepted the stipulation regarding admission of [the] hearsay testimony." *Id.* The court further found that Plitman "suffered no prejudice" as a result of the hearsay statement's admission because, although the declarant's testimony about his conversation with [the witness] was damaging to Plitman, the government presented substantial additional evidence to support the conviction." *Id.* n. 3.

---

[16]     The Second Circuit observed that in *Clemmons*, the Eighth Circuit "faced an entirely different set of facts in which neither defendant nor his counsel agreed to waive defendant's right to confrontation." 194 F.3d at 64 (citing *Clemmons*, 124 F.3d at 956). The Circuit court in *Plitman* explicitly declined to follow the Eighth Circuit's statement in *dicta* that counsel's waiver nonetheless would have been ineffective.

The *Plitman* court cited the Tenth Circuit Court of Appeals' decision in *Hawkins v. Hannigan*, 185 F.3d 1146, 1154-56 (10th Cir. 1999), in which the Tenth Circuit Court of Appeals recently held that defense counsel could stipulate to the admission of hearsay evidence. The hearsay in *Hawkins* entailed a police officer who relayed the identification of defendant by the elderly crime victim, who did not testify at trial. *Hawkins*, 185 F.3d at 1154-56. "Defense counsel understood this evidence to include audiotapes of her interviews with the police, but counsel was apparently unaware that the stipulation would also cover a police officer's testimony that the victim had picked the defendant out of a photo lineup." *United States v. Aptt*, 354 F.3d 1269, 1282 (10th Cir. 2004) (citing *Hawkins*, 185 F.3d at 1154). On habeas review, the Tenth Circuit in *Hawkins* determined that defense counsel had validly waived his client's Confrontation Clause rights, and that the stipulation did not constitute ineffective assistance of counsel. *Id*. at 1156-57 (relying upon three circuit court opinions for the proposition that "counsel in a criminal case may waive his client's Sixth Amendment right of confrontation by stipulating to the admission of evidence, so long as the defendant does not dissent from his attorney's decision and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy." *United States v. Stephens*, 609 F.2d 230, 232-33 (5th Cir.1980) (quoted in *Hawkins*, 185 F.3d at 1155); *see also Cruzado v. Puerto Rico*, 210 F.2d 789, 791 (1st Cir.1954) ("Where an accused is represented by counsel, we do not see why counsel, in his presence and on his behalf, may not make an effective waiver of [the right of confrontation]."); *Wilson v. Gray*, 345 F.2d 282, 286 (9th Cir. 1965) ("[T]he accused may waive his right to cross examination and confrontation and . . . the waiver of this right may be accomplished by the accused's counsel as a matter of trial tactics or strategy."); *accord United States v. Aptt*, 354 F.3d at 1284 ("*Hawkins*

held that counsel had effectively waived the defendant's rights by stipulation *despite* the attorney's apparent confusion about the scope of that stipulation.") (emphasis in original); *see also United States v. Reveles*, 190 F.3d 678, 683 n.6 (5th Cir. 1999). Other federal courts have read *Plitman*, decided subsequently to *Hawkins* and *Wilson*, to indicate that the waiver may be made by counsel for the defendant as a matter of trial strategy, and "because a defendant does not have a right to dictate trial strategy, Petitioner's objection to counsel's waiver does not take the matter outside the realm of firmly established federal law." *Allerdice vl Schriro*, No. CV-07-8049-PCT-NVW), 2008 WL 4541023, at *15 (D. Ariz. Oct. 8, 2008) (denying habeas relief).

The Tenth Circuit in *Aptt* discussed "how to interpret the requirement that 'the attorney's decision [can be said to be] a legitimate trial tactic or part of a prudent trial strategy.'" 354 F.3d at 1283 (quoting *Hawkins*, 185 F.3d at 1155). The *Aptt* panel observed,

> The cases cited in *Hawkins* focused on the issue of whether the right to confront witnesses was waivable by counsel or only by the defendant personally. Thus, their common reference to "trial tactics and strategy" were meant primarily to locate the decision to stipulate within the domain of trial strategy, where the attorney is master–not to invite subsequent tribunals to consider whether the stipulation was the wisest course of action. Elsewhere in the opinion, *Hawkins* makes this clear by saying that a waiver will be valid when done "pursuant to a *reasonable* trial strategy," *id.* n. 5 (emphasis added [by *Aptt* court]), and we have since held that *Hawkins* is satisfied if "the attorney appear[s] to have an objectively reasonable strategy" when he or she waives Confrontation Clause rights. *Bullock v. Carver*, 297 F.3d 1036, 1058 (10th Cir. 2002).

*United States v. Aptt*, 354 F.3d at 1283 (alterations in original).[17]  In *Torrence v. Ozmint*, the

---

[17]        The Tenth Circuit in *Aptt* extensively discussed the considerations underlying trial counsel's decisions concerning his client's Confrontation Clause rights:

> Mr. Murphy would have us find his attorney's waiver invalid because the attorney did not specifically consider whether to pursue the hearsay objection, but rather overlooked it. We are not convinced that counsel's stipulation was so careless. Assuming that the "smoking gun" and other

petitioner asserted that the statement of his wife and co-defendant was not admissible as evidence against him, and that his trial counsel was ineffective for failing to object to the use of such statement. The magistrate judge in *Torrence* concluded that trial counsel could have lodged a viable objection to the use of petitioner's wife's statement based on the hearsay rule and *Bruton v. United States*, 391 U.S. 123, *supra*. However, trial counsel testified at the habeas hearing that no objection was made because the statement was helpful to the defense; because trial counsels' motion to suppress the petitioner's final confession, had been denied, and because the joint statement of the petitioner and his wife tended to minimize the petitioner's role in the murder as

----

exhibits would have been admitted even without the stipulation, the defense's best theory was that they exonerated by showing that he, too, had been duped by Mr. Aptt. It would be difficult to argue convincingly that the memo exonerates Mr. Murphy after strenuously objecting to its admission, and even denying that he had written it, in the presence of the jury. And even if the memo's admissibility could have been challenged without alerting the jury, it may be that defense counsel determined that the likelihood of successfully excluding the stipulated exhibits was small enough that it would be more advantageous for his client to bolster his credibility by expressing, in the presence of the jury, a willingness to let them see all of the evidence.

But even assuming that Mr. Murphy's trial counsel did overlook the potential hearsay objection, that cannot by itself justify holding his waiver invalid. If a timely objection had been made, for all we know, the government could have laid a proper foundation for admission of the memo into evidence. Defense counsel's oversight (if that is what it was) had the effect of inducing both the government and the trial judge not to bother with doing so. To reverse Mr. Murphy's conviction because Exhibit 352 was wrongly admitted would be to allow him singlehandedly to create below the grounds for his triumph on appeal. *See United States v. Hardwell*, 80 F.3d 1471, 1487 (10th Cir.1996) ("A defendant cannot invite a ruling and then have it set aside on appeal.").

Mr. Murphy's position amounts to a claim that a trial counsel's waiver is deficient whenever trial counsel is not fully aware of all the possible legal arguments that could be raised in support of the intentionally abandoned position. Requiring this kind of lawyerly omniscience would make effective waivers exceedingly rare, to the detriment of defendants as well as the government. The power to waive rights is an important bargaining chip with which defendants can often gain substantial concessions from the government. But a waiver that is invalid as soon as a party thinks of a new reason for asserting the waived right is no waiver at all. *See Perez*, 116 F.3d at 852 (Kleinfeld, J., concurring). Furthermore, invalidating waivers because of mere oversights would make us into after-the-fact backseat drivers to defense counsel, constantly revisiting whether there were arguments that (in our opinion) the trial attorney should have raised.

*Aptt*, 354 F.3d at 1284 (footnote omitted).

compared with his final statement, counsel made the tactical decision not to object to the use of the statement. *Torrence*, 2008 WL 628604, at *13 (D. S.C. Mar. 5, 2008) (citing *Strickland*, 466 U.S. at 689. In his objections, petitioner Torrence argued that his counsels' decision not to object to the use of the joint statement was objectively unreasonable. However the district court held that after reviewing the record, it found that petitioner had not overcome he presumption that his counsels' performance fell within the range of reasonably professional assistance. Thus, the Court finds that the Petitioner has not overcome the presumption that, under the circumstances, the challenged action was sound trial strategy on the part of his counsel. *Id.*

On the one hand, the Court finds it troubling why trial counsel did not at least raise some objection to the introduction of Gaines' written statement to the police inculpating petitioner. On the other hand, perhaps trial counsel, having scored a "win" in obtaining the admission of technically inadmissible testimony, chose not to "push his luck" by objecting further, out of fear that the trial judge would change his mind on the admissibility of the trial transcript–because the trial judge appeared to infer that he was requiring the admission of the written statement to provide "balance." However, determining counsel's motives in not objecting to the admission of Gaines' written statement is made quite difficult on a bare reading of the record. *See Wyatt v. Digugliemo*, No. 2:04-CV-148-WY, 2004 WL 2367835, *9 (E.D. Pa. Oct. 20, 2004), *report and recommendation adopted*, 2005 WL 1114350 (E.D. Pa. May 10, 2005). In *Wyatt*, petitioner made an allegation of ineffective assistance of counsel for failure to seek redaction or, alternatively, severance of a co-defendant's statement pursuant to the *Bruton* rule and argued that trial counsel could have had no reasonable basis for failing to request redaction or severance. Although the district court stated that it must defer to the state court's ruling that petitioner failed to show that

counsel had no rational or strategic basis for his actions, and itself noted that counsel's strategy was "irrational or not based in sound trial strategy." However, it observed that "absent an evidentiary hearing, any musings about counsel's strategy are mere speculation based on a blind reading of the transcripts." *Id.*

Here, there is no doubt that trial counsel overall pursued a well-planned, cogent defense strategy and secured a significant benefit for the defense, the admission of Gaines' exculpatory testimony. *Strickland* has admonished courts not to second-guess trial counsel's reasonable strategy decisions. In this Court's opinion, however, it would have been better practice for trial counsel to have objected to the admission of the written statement. The Court wishes to emphasize that is not saying that trial counsel should have objected to the admission of Gaines' cross-examination testimony, wherein the prosecutor reviewed his statement sentence by sentence. Under these circumstances, as a result of his chosen defense theory, trial counsel was forced to accept some bad with the good. Moreover, trial counsel would have had little chance in succeeding as the trial court's admission of the transcript of Gaines' testimony in its entirety was a correct ruling. *Compare with Roy v. Coplan*, CIV. 03-206-JD, 2004 WL 603412, at *5-6 (D. N.H. Mar. 30, 2004). However, the Court does not see why there was any need for the written statement to be introduced as a separate trial exhibit. "It is well established that prior inconsistent testimony may be used for the purposes of impeachment." *Perez v. Greiner,* No. 01 CIV. 5522(AKH), 2002 WL 31132872, at *5 (S.D.N.Y. Sept. 25, 2002) (citing *United States v. Klein*, 488 F.2d 481, 483 (2d Cir. 1973)); *see also People v. Raja*, 77 A.D.2d 322, 325, 433 N.Y.S.2d 200, 202 (2d Dept. 1980) ("If a witness, not necessarily a party to action, has made, prior to trial, written or oral statement contrary to his testimony at trial, earlier statement may be introduced as

prior inconsistent statement, which statement may be used solely to impeach credibility of witness but may not be offered as substantive proof of truth of its contents."). Even if there was no dispute that a prior inconsistent statement was made, a jury will need specific instruction in order to understand that a prior inconsistent statement, not given under oath, may be used for impeachment, that is, to determine the credibility of the maker's testimony, but not as substantive evidence. Without specific instruction as to the limited purpose of the prior inconsistent statement, the jury will have a natural tendency to consider it as substantive evidence. A further area of concern is trial counsel's apparent failure to request that a limiting instruction be given at the time that Investigator Schultz read Gaines' written statement into the record. Fortunately, however, the trial court did give a limiting instruction during its final charge to the jury; however, as discussed further, *infra*, it was not a model of clarity.

"If the impeachment evidence is also used as substantive evidence, a constitutional violation may result, depending on the nature and quality of the evidence and the other proof." *Perez*, 2002 WL 31132872, at *5. Here, we are faced with a situation where the jury's use of Gaines' written statement as substantive evidence would result in a Sixth Amendment *Bruton* error. However, the unique facts of this case persuade me that trial counsel's handling of the issue did not result in actual, substantial prejudice to petitioner. In reaching this conclusion, the Court has found several decisions instructive, including the Second Circuit's decision *United States ex rel. Pugach v. Mancusi*, 441 F.2d 1073, 1075 (2d Cir. 1971).There, petitioner Pugach contended that "the admission in evidence during trial of his co-defendant's confession–concededly inculpatory of Pugach–violated his right of confrontation. The Second Circuit agreed with the district court that finding a *Bruton* violation was unjustified on the facts of Pugach's

case, for unlike the situation in *Bruton*, or in *Douglas v. Alabma*, 380 U.S. 415 (1965), "where there was no opportunity for effective cross-examination of the confessor, Pugach's co-defendant Heard Harden took the stand, 'affirmed the statement as his,' *Douglas v. Alabama*, *supra*, 380 U.S. at 420, 85 S.Ct. 1074, but denied its truth, asserting that it had been coerced from him by a combination of beatings, threats, and promises." *Id.* That is essentially what happened in this case; although Gaines did not "testify" at Scott's trial, his complete trial testimony was introduced, in which he "affirmed the statement as his" "but denied its truth," asserting that he had been lying in order to protect his friend Gillette (Latson).

In *Henry v. Scully*, trial counsel was charged with having been ineffective in his handling of the incriminating statement made by petitioner's co-defendant. The district court observed that there was "no *per se* rule that this particular type of trial error–that is, the failure to contend adequately with incriminating statements made by a co-defendant–automatically constitutes an error of constitutional magnitude, a review of the record in [Henry's] case shows that counsel's failure both fell below an objective standard of reasonableness, and prejudiced the petitioner's defense such that there is a reasonable probability the outcome would have differed in the absence of the unprofessional error." 918 F. Supp. 693, 698 (S.D.N.Y. 1995) (citations omitted), *aff'd.* 78 F.3d 51, 53 (2d Cir. 1996). The district court noted that although Henry's trial counsel could not prevent the statement from coming in, since the co-defendant was testifying at trial, counsel failed to ensure that the co-defendant's confession, if believed, would not be used against petitioner Henry. The district court found, and the Second Circuit agreed, that there was "no possible strategy which would have justified allowing [the co-defendant's] confession to be used as evidence against Henry." *Id.* Even allowing for the possibility that it could have been "a

reasonable strategy not to ask for a limiting instruction at the time the evidence of [the co-defendant's] confession was received (in order not to highlight the remarks about Henry), there was no strategic value in foregoing efforts to assure that [the co-defendant's] confession, if believed, would not be used against Henry." *Id.* (citing *Mason v. Scully*, 16 F.3d 38, 42 (2d Cir. 1994) (noting counsel's duty to protect a defendant from having "the incriminating hearsay statement of a nontestifying codefendant admitted in evidence against him")). In *Henry v. Scully*, the trial judge had erroneously instructed the jury that it could consider the co-defendant's confession against both defendants. Moreover, the prosecution' argued on summation that there were "two witnesses," one of whom was the co-defendant, against Henry. Trial counsel failed to object to either of these flagrant errors. In the present case, Scott's counsel did not ask for a limiting instruction to be given contemporaneously with Gaines' statement being read into evidence. In this Court's opinion, it would have been better practice for counsel to have requested a limiting instruction at the time the evidence came in. However, as the district court noted in *Henry*, it is possible that this was deliberate as a matter of trial strategy to avoid unduly emphasizing the statement's importance.

The record contains no indication that trial counsel specifically requested such an instruction–but, in any event, one was given during the final charge regarding the jury's use of "prior inconsistent statements" made by witnesses, and it specifically referenced Gaines. The charge given, although not a model of clarity, correctly stated the law–unlike the regrettable situation in *Henry*, where the trial court instructed the jury in a manner expressly violative of the defendant's *Bruton* rights.

The Court finds that trial counsel's omissions in connection with Gaines' written

statement threatened to undo all of the benefits he had obtained for his client through persuading the trial court to introduce Gaines' trial testimony. However, the Court is mindful of *Strickland*'s admonition that "[t]he object of an ineffectiveness claim is not to grade counsel's performance[,]" and therefore "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." 466 U.S. at 697. The Supreme Court has stated that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . , that course should be followed." *Id.* Although the Supreme Court in *Strickland* discussed and decided the performance component of the petitioner's ineffectiveness claim prior to the prejudice component, it stated that there is "no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697. Accordingly, this Court will move on to the prejudice prong of the *Strickland* inquiry.

To sufficiently demonstrate prejudice, Scott must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986). While petitioner is not required to prove "that counsel's deficient conduct more likely than not altered the outcome in the case," *Strickland*, 466 U.S. at 693, he must show "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt[,]" *id.* at 695.

"Where, as here, petitioner's claim rests in part upon the failure to object to the admission of evidence, it is necessary to determine whether the evidence was so damaging that counsel's failure to object deprived petitioner of the 'reasonably effective assistance' to which he is

entitled." *Quartararo v. Fogg*, 679 F. Supp. 212, 240 (E.D.N.Y. 1988). "[I]n determining the

existence *vel non* of prejudice, the court 'must consider the totality of the evidence before the

judge or jury.'" *Kimmelman v. Morrison*, 477 U.S. at 381 (quoting *Strickland*, 466 U.S. at 695).

"Even if the evidence admitted as the result of counsel's error 'may not have been as important

as other components of the State's case, it may have tipped the balance.'" *Henry*, 918 F. Supp. at

717 (quoting *Kimmelman*, 477 U.S. at 390). The Supreme Court has explained that

> [t]he term "unfair prejudice," as to a criminal defendant, speaks to the capacity of
> some concededly relevant evidence to lure the factfinder into declaring guilt on a
> ground different from proof specific to the offense charged. *See generally* 1 J.
> Weinstein, M. Berger, & J. McLaughlin, Weinstein's Evidence ¶ 403(03) (1996)
> (discussing the meaning of "unfair prejudice" under Rule 403). So, the Committee
> Notes to Rule 403 explain, "'Unfair prejudice' within its context means an undue
> tendency to suggest decision on an improper basis, commonly, though not
> necessarily, an emotional one." Advisory Committee's Notes on Fed. Rule Evid.
> 403, 28 U.S.C.App., p. 860.

*Old Chief v. United States*, 519 U.S. 172, 180 (1997). The Court notes that the Appellate

Division, although it found the underlying claim of evidentiary error unpreserved, it nevertheless

concluded that any error was harmless because the jury had already heard the substance of

Gaines' written statement through his trial testimony. It bears examining what the Appellate

Division meant by "harmless".  In *People v. Crimmins*, 36 N.Y.2d 230 (N.Y. 1975), the New

York Court of Appeals specifically adopted the harmless error standard enunciated by the

Supreme Court for cases on direct review that involve constitutional violations. *Crimmins*, 36

N.Y.2d at 241-42 (citing *Chapman v. California*, 386 U.S. 18 (1967) (holding, on direct review

of criminal conviction, that court must find "that there is no reasonable possibility that the

constitutional error might have contributed to defendant's conviction and that it was thus

harmless beyond a reasonable doubt")). It is well established that the *Chapman* harmless error

standard is more generous to defendants than the *Brecht v. Abrahamson* standard applied on

collateral review. The proper inquiry in post-AEDPA habeas cases (regardless of whether the

state court has decided the harmless error issue) is to measure the harmfulness of the error

against the *Brecht* "substantial and injurious effect" standard. The Supreme Court has explained

that the *Strickland* standard of prejudice "necessarily entails the conclusion that the suppression

must have had 'substantial and injurious effect or influence in determining the jury's verdict,'

*Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)

(quotation omitted). Thus, the *Strickland* and *Brecht* standards are essentially analogous.

*Dennard v. Kelly*, No. 90-CV-203E, 1996 WL 774568, at *9 n.6 (W.D.N.Y. June 5, 1996).

The "principal factors" to be considered are the "importance of . . . the testimony, and the

overall strength of the prosecution's case." *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000)

(citing *Brecht v. Abrahamson*, 507 U.S. at 638-39) (holding that the harmlessness inquiry on

habeas review "is whether, in light of the record as a whole," the error " 'had substantial and

injurious effect or influence in determining the jury's verdict.'") (quoting *Kotteakos v. United

States*, 328 U.S. 759, 776 (1946). "[T]he strength of the prosecution's case 'is probably the

single most critical factor in determining whether error was harmless,'" *Id.* (quoting *Latine v.

Mann*, 25 F.3d 1162, 1167-68 (2d Cir.1994) (internal quotation marks omitted in original), *cert.

denied*, 514 U.S. 1006 (1995)); *see also Strickland*, 466 U.S. at 695-96 (the determination

whether petitioner has made the requisite showing of prejudice is based on "the totality of the

evidence before the judge or jury" because "[s]ome errors will have had a pervasive effect . . .

and some will have had an isolated, trivial effect" and because the resulting prejudice, if any,

necessarily depends on the strength of the prosecution's case).

Here, after reviewing the record in its entirety, and in light of the particular and unique circumstances of this case, the Court believes that the totality of the evidence properly before the jury was so compelling that there is no reasonable probability or possibility that the outcome of the trial would have been different had trial counsel objected to Gaines' statement on Sixth Amendment grounds. I note that petitioner's own written confession, which this Court specifically has found to have been uncoerced and truthful, established him as the instigator of the crime. Scott admitted that he had originally solicited Latson to do the job, but was turned down, which led him to enlist Gaines' help. Scott stated in his confession that he had no idea how Gaines obtained the gun; Gaines, in his written statement, claimed that Scott procured the .380 for him. I note that the jurors, in the affidavit provided by juror Jean McCarthy, apparently did not believe that Scott gave Gaines the gun. However, whether or not Scott had anything to do with actually providing the gun to Gaines, was irrelevant to determining whether Scott was complicit, as an accomplice, in the attempted forcible robbery of the victim. By his own statements, Scott admitted that he knew, prior to the robbery, that Gaines had a gun, since he was offering to sell a .380 to the partygoers at Scott's apartment. Therefore, the Court concludes that its confidence in the verdict is not undermined even had the alleged errors on the part of trial counsel not occurred. *See Strickland*, 466 U.S. at 694. Because Scott has not established, in this Court's opinion, the existence of prejudice flowing from counsel's performance, his *Strickland* claim cannot succeed. Because he has not established constitutionally deficient assistance on trial counsel's part, he cannot use trial counsel's alleged ineffectiveness as "cause" to excuse the procedural default of the underlying evidentiary claim. That claim is procedurally barred, and I

dismiss it on that basis.

> **2.** **The Trial Court's Admission of Investigator Schultz's Rebuttal Testimony Concerning Co-Defendant Gaines' Oral Statements Made During Plea Negotiations Prior to His Trial**

As a further part of Ground One, Scott contends that the trial court erred in allowing Investigator Schultz to testify in rebuttal regarding oral statements Gaines made during a meeting with Investigator Schultz (who was at that time working for the Monroe County District Attorney's Office) and the prosecutor. The Appellate Division held that "[t]he rebuttal testimony of an investigator was properly admitted to impeach the credibility of Gaines, an unavailable hearsay declarant[.]" *People v. Scott*, 262 A.D.2d at 1021(citing *People v. Delvalle*, 248 A.D.2d 126, 127 (App. Div. 1st Dept.) ("The court properly admitted, as a prior inconsistent statement to impeach a hearsay declarant's credibility, the rebuttal testimony of a prosecution witness who stated that he overheard the unavailable hearsay declarant implicating defendant in the murders. This statement directly contradicted the hearsay declarant's statement exonerating defendant, which defendant had placed in evidence as a declaration against penal interest. '[I]f there was never any opportunity to cross-examine the declarant, the inconsistent statement may be shown without a foundation' (Prince, Richardson on Evidence § 8-111 (Farrell 11th Ed.")), *lv. denied*, 92 N.Y.2d 896 (N.Y. 1998)).

It is well-settled that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Under both New York and Federal rules of evidence, a party may cross-examine an adversary as to a prior statement inconsistent with the witness's present testimony. *Galdamez v. Keane*, Nos. 2000-CV-4066 (JBW), 03-MISC-0066 (JBW), 2003 WL 21847382, at *11 (E.D.N.Y. Aug. 4, 2003) (citing Prince, Richardson on Evidence § 6-411

at 405 (11th ed. Farrell)); *People v. DelValle*, 248 A.D.2d at 127; Federal Rule of Evidence 806 ("When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain."); *Annuziata v. City of New York*, No. 06 Civ. 7637(SAS), 2008 WL 2229903, at *12 (S.D.N.Y. May 8, 2008).

However, the declarant in this case happened to be Scott's co-defendant, and it appears to this Court that a *Bruton* issue was presented by Investigator Schultz's rebuttal testimony, inasmuch as co-defendant Gaines' allegedly told the investigator and the assistant district attorney that his statement implicating Scott was truthful and that he would testify against him in exchange for a plea deal. There was an ostensibly helpful aspect to the rebuttal testimony, in that Gaines' again implicated Latson as a participant in the robbery, and insisted that part of the plea deal's conditions, he wanted Latson arrested and charged. These statements were consistent with Gaines' trial testimony in which he declared that Latson, not Scott, had procured the gun for him and that Scott was innocent. As discussed above, given the very unique circumstances of this case, the Court is of the opinion that any error in admitting the rebuttal testimony was harmless. Accordingly, habeas relief is not warranted on this claim.

### 3. Inadequacy of the Trial Court's Limiting Instruction

On direct appeal, the Appellate Division rejected this claim as follows:

By failing to request a limiting instruction or to object to County Court's

> instructions to the jury concerning the use of impeachment evidence, defendant
> failed to preserve for our review his present contention that the court's
> instructions were inadequate (*see*, *People v. Kostora*, 251 A.D.2d 1082, 675
> N.Y.S.2d 573, *lv. denied* 92 N.Y.2d 1034, 684 N.Y.S.2d 499, 707 N.E.2d 454).

*People v. Scott*, 262 A.D.2d at 1021). Respondent asserts that the Appellate Division relied upon

an adequate and independent state ground– the failure to object at trial when required by New

York's contemporaneous objection rule, C.P.L. § 470.05. The Second Circuit has held, in

substantially the same circumstances as those presented here, that C.P.L. § 470.05(2) is an

adequate and independent state ground. *See Franco v. Walsh*, No. 02-2377, 73 Fed. Appx. 517,

518, 2003 WL 22056234, at *2 (2d Cir. Sept. 4, 2003) (finding petitioner's claim of an erroneous

jury charge procedurally defaulted because "[n]o contemporaneous objection to the charge was

lodged, and the Appellate Division found that the issue was therefore unpreserved."); *see also*

*Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir. 1999) ("[W]e have observed and deferred to New

York's consistent application of its contemporaneous objection rules.") (citing *Bossett v. Walker*,

41 F.3d 825, 829 n.2 (2d Cir.1994) (respecting state court's application of C.P.L. § 470.05(2) as

adequate bar to federal habeas review), *cert. denied*, 514 U.S. 1054 (1995), *Fernandez v.*

*Leonardo*, 931 F.2d 214, 216 (2d Cir.) (noting that failure to object at trial constitutes adequate

procedural default under C.P.L. § 470.05(2)), *cert. denied*, 502 U.S. 883 (1991)); *Glenn v.*

*Bartlett*, 98 F.3d 721, 724-25 (2d Cir. 1996) (failure to object constituted adequate and

independent state ground); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (violation of

New York's contemporaneous objection rule is an adequate and independent state ground);

*Alvarez v. Scully*,  833 F. Supp. 1000, 1009 (S.D.N.Y. 1993) (doctrine of procedural default

barred habeas corpus petitioner's claim that his rights to due process of law and fair trial were

violated by New York trial court's failure to instruct jury that petitioner could not be convicted of burglary if he had mistaken belief that he was licensed to be in victims' apartment, where petitioner's trial counsel neither requested such instruction nor objected to charge on that ground, and there was no reason to believe that New York Supreme Court, Appellate Division's affirmance without opinion reflected decision on merits of that claim).

Absent any showing by petitioner of cause and prejudice, *see Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), or a demonstration that failure to consider the federal claim will result in a "fundamental miscarriage of justice[,]" *Murray v. Carrier*, 477 U.S. 478, 495 (1986) (quotation omitted), this claim will be barred by the doctrine of procedural default. As discussed above in this Decision and Order, the Court did not find that Scott's claim of ineffective assistance of trial counsel could constitute "cause" to excuse a procedural default. Scott has not asserted any alternative bases for finding "cause" and on this record, the Court discerns none. Accordingly, this claim is dismissed as procedurally barred.

### B. Ground Two: The Verdict Was Against the Weight of the Evidence and Was Based on Legally Insufficient Evidence (Petition, ¶12(B)

In a federal habeas corpus proceeding challenging the sufficiency of the evidence underlying a state court conviction, the federal court must determine whether the evidence was sufficient to support a finding of guilt beyond a reasonable doubt, with explicit reference to the substantive elements of the criminal offense as defined by state law. *Jackson v. Virginia*, 443 U.S. 307, 324 n. 16 (1979). The *Jackson* court explained,

> [T]his inquiry does not require a court to "ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt.

*Id.* at 318-19 (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966) (emphasis in original). "Under this standard, the trier of fact is left to fairly resolve conflicts or discrepancies in the testimony by weighing the evidence and drawing reasonable inferences." *Henry v. Scully*, 918 F. Supp. 693, 708 (S.D.N.Y. 1995) (citing *Jackson*, 443 U.S. at 318-19), *aff'd* 78 F.3d 51 (2d Cir. 1996). It is the jury's function to decide whether the prosecution witnesses' version of the events was believable; as a federal habeas court, I cannot reverse the jury's determination that these witnesses were more credible than the defense witnesses. *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (citations omitted) (stating that it is well settled that the jury is exclusively responsible for determining a witness' credibility); *see also United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) (Where there is conflicting testimony at trial, the reviewing court "defer[s] to the jury's resolution of the witnesses' credibility.'") (quoting *United States v. Payton*, 159 F.3d 49, 56 (2d Cir.1998)); *accord, e.g.*, *Mapp v. Clement*, 451 F. Supp. 505, 510 (S.D.N.Y.), *aff'd*, 591 F.2d 1330 (2d Cir. 1978), *cert. denied*, 440 U.S. 948 (1979); *United States ex rel. Cole v. LaVallee*, 376 F. Supp. 6, 11 (S.D.N.Y. 1974); *Robinson v. Smith*, 530 F. Supp. 1386, 1390 (W.D.N.Y.1982) ("[W]hether a witness is relating the truth is a factual matter exclusively within the province of the jury to determine.").

Whereas a legal sufficiency claim is based on federal due process principles, a "weight of the evidence" argument is a pure state law claim grounded in the criminal procedure statute, *People v. Bleakley*, 69 N.Y.2d 490, 495 (N.Y. 1987).[18] Since a "weight of the evidence claim" is

---

[18]   The New York Court of Appeals explained the difference as follows:

purely a matter of state law, it is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a)

(permitting federal habeas corpus review only where the petitioner has alleged that he is in state

custody in violation of "the Constitution or a federal law or treaty"); *Estelle v. McGuire*, 502 U.S.

at  68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States.").  It is well-settled that a

reviewing court is not permitted to reassess the fact-specific credibility judgments by juries or

weigh conflicting testimony. *See United States v. Giraldo*, 80 F.3d 667, 673 (2d Cir.) ("The

weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal."),

*cert. denied* , 519 U.S. 847 (1996). Thus, Scott's claim that the verdict was against the weight of

the credible evidence does not provide a colorable basis for federal habeas relief.

     I turn now to the question of whether there was legally sufficient evidence so as to satisfy

the requirements of due process.  Scott's argument, as framed by appellate counsel, was that

there was "no testimony of any sort, absent the second statement of [petitioner] of October 27,

---

Although the two standards of intermediate appellate review-legal sufficiency and weight of evidence-are related, each requires a discrete analysis. For a court to conclude . . . that a jury verdict is supported by sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged. If that is satisfied, then the verdict will be upheld by the intermediate appellate court on that review basis.

To determine whether a verdict is supported by the weight of the evidence, however, the appellate court's dispositive analysis is not limited to that legal test. Even if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further. If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony."

*People v. Bleakley*, 69 N.Y.2d at 495 (citations omitted).

1994, that [petitioner] had participated or acted in any fashion directly related to the purported attempted robbery charge." Pet'r App. Br. at 20, Resp't Ex. F at 26. Appellate counsel noted that the "only evidence concerning the production [sic] of the gun by [petitioner] came from the inadmissible October 25, 1994[,] statement of Glaston W. Gaines, which statement also appears to have been rejected by the jury on its facts [sic]." *Id.* (citing Affidavit of Juror Jean McCarthy, submitted in connection with the C.P.L. § 330.30 motion).

It is true that under New York law, C.P.L. § 60.50 provides that "[a] person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed". N.Y. CRIM. PROC. LAW § 60.50. This additional proof, however, may consist of circumstantial evidence that a crime occurred and it need not directly connect the defendant to the crime. *E.g., People v. Curro*, 161 A.D.2d 784, 785 (App. Div. 2d Dept. 1990) (citing *People v. Lipsky*, 57 N.Y.2d 560, 563 (N.Y. 1982)). "This statutory corroboration requirement [of C.P.L. § 60.50] does not mandate submission of independent evidence of every component of the crime charged . . . , but instead calls for 'some proof, of whatever weight, that a crime was committed by someone.' In addition, 'no corroboration of the underlying felony is required in a felony murder prosecution based largely on a confession. . . . In a felony murder prosecution, the underlying felony is used as a substitute for establishment of the mental element of the crime of murder-the defendant's malicious criminal intent." *People v. Chico,* 90 N.Y.2d 585, 589-90 (N.Y. 1997). Here, Scott's written confession, and Investigator Schultz's and Sheridan's testimony about his oral statements to them, if believed by the jury, were more than sufficient to show Scott possessed the requisite mental culpability–that is, he "solicited, requested, commanded, importuned or intentionally

aided" Gaines to attempt to rob Poochie, during the course of which robbery Gaines fatally shot

Poochie. Thus, the evidence to support Scott's conviction for felony murder, as accomplice, was

not constitutionally lacking. *Accord Cassie v. Graham*, 06 CIV. 5536 PKCAJP), 2006 WL

4007858, at *21 (S.D.N.Y. Jan. 31, 2007) (citing *People v. Chico,* 90 N.Y.2d at 589-90; *People

v. Davi*s, 46 N.Y.2d 780, 780 (N.Y. 1978) ("C.P.L. 60.50 does not require corroboration of

defendant's confession to the underlying predicate felony of robbery" to be convicted of

felony-murder.); *People v. Duke*, 160 A.D.2d 1017, 1018 (App. Div. 2d Dept. 1990) (explaining

that "'[i]t is only necessary to show by other evidence that the crime charged has been

committed by some one; in order to comply with [C.P.L.] section 60.50, it is not necessary that

the other evidence connect the defendant with the crime'"); *People v. McDaniel*, 114 A.D.2d

336, 336 (App. Div. 1ˢᵗ Dept. 1985) (holding that even though the victim could not identify the

defendant, because the defendant admitted he was there during the robbery, "[t]he jury was

entitled to accept that part of the defendant's statement without having to accept [another part of

his claim] that he ran away" when someone else displayed a weapon.).

### C. Ground Three: Petitioner's Statement to the Police Was Involuntary (Petition, ¶12(C).

It is well established that once an accused is "in custody" of law enforcement officials, he

or she must be informed of the constitutional rights to remain silent and to have counsel

appointed; an accused's waiver of those rights, to be effective, must be voluntarily, knowingly

and intelligently made. *E.g.*, *Colorado v. Spring*, 479 U.S. 564, 572-573 (1987); *Miranda v.

Arizona*, 384 U.S. 436, 444 (1966). The Supreme Court has held that the voluntariness of a

habeas petitioner's confession is a question of law entitled to de novo review by a federal court.

*Miller v. Fenton*, 474 U.S. 104, 112 (1985); *see also Thompson v. Keohane*, 516 U.S. 99 (1995).

Because subsidiary questions (such as the length and circumstances of the interrogation, the

defendant's prior experience with the legal process, and the defendant's familiarity with the

*Miranda* warnings) often require the resolution of conflicting testimony of police and defendant,

state-court factual determinations on these issues are entitled to the presumption of correctness

called for by the federal habeas statute under 28 U.S.C. § 2254(e)(1)[19] (pre-AEDPA, 28 U.S.C. §

2254(d)). *Miller*, 474 U.S. at 117.

On direct appeal, the Appellate Division held that "[t]he evidence at the suppression

hearing supports the court's determination that defendant waived his rights and made his

statement knowingly, voluntarily and intelligently[.]" *People v. Scott* (quotation omitted). Based

upon my review of the suppression hearing transcript and the rest of the record in this case, I do

not find that the Appellate Division incorrectly applied clearly established Federal law in so

holding. However, I do not believe that the trial court's analysis was correct in that it conflated

all the factors that must be considered in determining voluntariness into one–whether or not the

police issued the *Miranda* warnings. The trial court seems to have based its conclusion that the

statement was voluntary simply on the fact that Scott was read the *Miranda* warnings. *See* H.123

---

[19]     As the Second Circuit has stated, a federal habeas court should review the state court's factual findings only to determine whether they were unreasonable in light of the evidence presented, 28 U.S.C. § 2254(d)(2), or whether the presumption that they are correct was rebutted by "clear and convincing" evidence, 28 U.S.C. § 2254(e)(1). *Channer v. Brooks*, 320 F.3d 188, 195-96 (2d Cir. 2003). In accordance with 28 U.S.C. § 2254, as modified by AEDPA, a habeas court's review of the state court determinations of facts is limited to an inquiry into whether the conclusion of the state trial court was unreasonable based on the evidence presented and whether petitioner has presented evidence in the District Court that clearly and convincingly rebuts the presumption that the state court's factual findings are correct. *Id.*; *accord*, *e.g.*, *Miller-El v. Cockrell*, 123 S.Ct. 1029, 1041 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).")

("The Court find [sic] that his rights having been read, the statement is admissible as a voluntary statement, to be admissible at trial."). The suppression court did not address petitioner's argument that he was too much under the influence of drugs and alcohol to understand the constitutional rights he was waiving. Nevertheless, as discussed below, the record does indicate that petitioner had the mental capacity and awareness to understand what he was doing when, after hearing the *Miranda* warnings, he decided to speak with the police. Therefore, I agree that Scott's statement was knowingly, voluntarily, and intelligently made.

The trial court's finding that Scott was read all of the *Miranda* warnings is a matter of historical fact subject to the presumption of correctness. To rebut that presumption, Scott offers only his self-serving assertion that the officers selectively recited only one of the rights. *See Tibbs v. Greiner*, No. 01Civ.4319(WK)(AJP), 2003 WL 1878075, *9 (S.D.N.Y. Apr. 16, 2003) ("Whether Tibbs was questioned before being advised of his *Miranda* rights by Detective Hayes is a matter of historical fact subject to the presumption of correctness under 28 U.S.C. § 2254(e)(1)."), *report and recommendation adopted in unpublished opinion*, *Tibbs v. Greiner*, No. 01Civ.4319 (S.D.N.Y. July 2, 2003) (Rakoff, J); *Holland v. Donnelly*, 216 F. Supp.2d 227, 231 (S.D.N.Y. 2002) ("[A]ccount of the events leading up to [petitioner's] confession" were "findings of historical fact [that] must be 'presumed to be correct' for purposes of [habeas] petition . . . ."); *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001).

Scott's argument essentially is that the suppression erred in crediting the police officers' version of events over his own. The conflicting aspects of the suppression hearing testimony that he has brought to this Court's attention were all presented to the suppression court at the hearing. The record adequately supports the conclusion that, contrary to Scott's contentions, the police

officers read him the entire set of *Miranda* warnings. Absent clear and convincing evidence, this Court is not permitted to re-evaluate the credibility of witnesses not before it, and has no basis here to disturb the state court's credibility determinations on that issue. *See Tirado v. Walsh*, 168 F. Supp.2d 162, 170 (S.D.N.Y. 2001) ("It is not within the purview of a federal court on habeas review to reassess and pass judgment upon the credibility of a witness whose testimony and demeanor it has not observed." Thus, where petitioner took "issue with the trial court's assessment of [the detective's] credibility and its decision to . . . credit [the detective's] testimony at the suppression hearing . . . , [the habeas] Court decline[d] to entertain [petitioner's] credibility claim . . ."); *Sanna v. DiPaolo*, 265 F.3d 1, 10 (1ˢᵗ Cir. 2001) (Where suppression hearing judge credited officers' testimony about the interrogation over petitioner's conflicting testimony, and the state appellate court "resoundingly endorsed its credibility assessment" on appeal, habeas court rejected *Miranda* claim where petitioner "simply insist[ed] that the officers' testimony was untrustworthy" and offered no clear and convincing evidence to rebut the factual finding. "Credibility is quintessentially a matter of fact, reserved in almost every circumstance for the trier. . . . [I]t would be wholly inappropriate for a federal court to repastinate[20] soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review.").

The legal determination as to whether a statement was, in fact, voluntarily made in light of all relevant facts is a question of law entitled to *de novo* review by a federal court. *Leka*, 76 F. Supp.2d at 275 (citations omitted). The test for determining whether a statement is voluntary or

---

[20]    To "repastinate" literally means "[t]o dig over again." OXFORD ENGLISH DICTIONARY (2d ed. 1989), http://dictionary.oed.com/cgi/entry/50202947?single=1&query_type=word&queryword=repastinate&first=1&max_t o_show=1. *See also* Dan Slater, *The Linguistic Talents of Judge Bruce Selya*, WALL STREET JOURNAL LAW BLOG, Feb, 4, 2008, http://blogs.wsj.com/law/2008/02/04/the-linguistic-talents-of-judge-bruce-selya-2/.

coerced under the due process clause is "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession. *Schneckloth* [*v. Bustamonte*], 412 U.S. [218,] 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 [(1973)]. The due process test takes into consideration 'the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation.'" *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting *Schneckloth*, 412 U.S. at 218); *accord, e.g., Tankleff v. Senkowski*, 135 F.3d 235, 244-45 (2d Cir. 1998); *Green v. Scully*, 850 F.2d 894, 901 (2d Cir.) ("No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances."), *cert. denied*, 488 U.S. 945 (1988).

In applying the totality of the circumstances test, the pertinent factors which merit consideration are "(1) the characteristics of the accused, (2) the conditions of [the] interrogation, and (3) the conduct of [the] law enforcement officials."' *Green*, 850 F .2d at 901-02. In connection with the third factor, whether a suspect has been advised of his rights under Miranda is an important consideration in determining whether a confession is voluntary. *See Davis v. North Carolina*, 384 U.S. 737, 740-41 (1966). As I determined above, Scott has not rebutted the state court's factual determination that he was properly advised of his constitutional rights.

Defense counsel argued that Scott's statement was involuntary and the product of coercion because the officers moved Scott from the main interrogation room to a smaller interview room, in order to "make him feel insecure and frightened," H.126. Those circumstances as described do not amount to an atmosphere so psychologically coercive as to deprive an accused of his due process rights.

Next, counsel asserted that it was evident from Scott's testimony that he was not intelligent enough to correct spelling errors, contrary to the officers' claim that Scott pointed out the spelling errors in his written statement and that they had him correct the errors and initial them. In light of the evidence brought out on cross-examination that petitioner had worked for a trucking company and had been required to prepare written reports regarding his deliveries, the contention about Scott's lack of intelligence is not persuasive.

Defense counsel also pointed to Scott's claim that he had ingested alcohol and smoked crack cocaine prior to the interrogation. He testified that he was high at the time he spoke to the police, while the police officers testified that he did not exhibit any signs of intoxication or drug-use. Even assuming that Scott had taken alcohol or drugs before his interrogation, "the fact that he may have done so is not dispositive." *United States v. Wyche*, 307 F. Supp.2d 453, 463 (S.D.N.Y. 2004). Courts in this Circuit have held that "[a] statement may still be voluntarily given even when the speaker is intoxicated or under the influence of drugs, as there is no *per se* rule that a confession given under such circumstances is involuntary." *Id.* (citing *Avincola v. Stinson*, 60 F. Supp.2d 133, 160 (S.D.N.Y.1999) (citing, *inter alia*, *United States v. Turner*, 157 F.3d 552, 555-56 (8th Cir.1998) (despite defendant being high on PCP, evidence showed that he understood his rights and knowingly waived them, and court declines to "adopt a *per se* rule ... when confronted with intoxication"); *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir.) (statement was voluntary where drugs taken did not impair defendant's mental capacity), *cert. denied*, 525 U.S. 878 (1998); *United States v. Brooks*, 125 F.3d 484, 491 (7th Cir. 1997) (statement voluntary despite claim that he was experiencing effects of crack cocaine, sleep deprivation and a hand injury, he was alert, coherent and possessed capability of making

informed and voluntary choices); *United States v. Christopher*, 94 Cr. 303, 1995 WL 366377 at *8-9 (S.D.N.Y. June 19, 1995) (defendant knowingly and intelligently waived *Miranda* rights despite his claim that he was under the influence of alcohol, where he stated that he understood rights and signed form confirming that he understood); *United States v. Grant*, 427 F. Supp. 45, 50 (S.D.N.Y. 1976) (statement voluntarily given by intoxicated defendant where "he was under control of his senses and fully understood the consequences of his statements," holding that "[c]onfessions given while under the influence of drugs are not *per se* involuntary confessions")). Scott's claim of being "high" and unable to comprehend what was occurring during the interrogation is undermined by the record of the suppression hearing, notably, several concessions during cross-examination, including agreeing that the alcohol and cocaine really had "[n]ot much" of an effect on him. H.119-20.

This Court's independent review of the hearing testimony does not convince it that Scott was intoxicated, and that even if he was feeling some effects of his alleged drug use earlier that day, he was not intoxicated as he claimed to be, certainly, not "so addled as to make that statement involuntarily given and in violation of the Fifth Amendment." *United States v. Wyche*, 307 F. Supp.2d at 463. Consequently, this ground of the petition challenging the voluntariness of Scott's statement to the police does not warrant habeas relief.

## VI.    Conclusion

For the reasons stated above, Matthew Scott's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

/s/ Hon. Victor E. Bianchini

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:     September 10, 2009
              Rochester, New York.